**MICROFINANCIAL, INC., et al., Plaintiffs, Appellees,**

v.

**PREMIER HOLIDAYS INTERNATIONAL, INC., et al., Defendants, Appellants.**

No. 04–1493.

United States Court of Appeals, First Circuit.

Submitted Dec. 10, 2003.

Decided Oct. 5, 2004.

Stephen F. Gordon, with whom Leslie F. Su and Gordon Haley LLP were on brief, for appellants.

Richard J. McCarthy, with whom Brian H. Lamkin and Edwards & Angell, LLP were on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

Following a two-day bench trial, the district court adjudged defendant-appellant Premier Holidays International, Inc. and its principal, defendant-appellant Daniel DelPiano, jointly and severally liable for fraud, breach of contract, and breach of the covenant of good faith and fair dealing. The court awarded plaintiff-appellee Microfinancial, Inc. and its wholly-owned subsidiary, Leasecomm Corporation (hereafter collectively MFI) damages in the amount of $23,000,000. The defendants appeal, assigning error to the denial of a motion to stay and to the admission of certain expert testimony. Finding these

assignments of error unpersuasive, we affirm the judgment below.

## I. BACKGROUND

The background facts are straightforward. MFI is a Massachusetts corporation that operates a commercial finance business. On August 6, 1998, it entered into a business loan agreement with Premier, a Florida corporation engaged in the marketing of vacation packages. Pursuant to the agreement, MFI extended a $500,000 revolving line of credit and Premier executed a promissory note secured by DelPiano's personal guaranty and by all outstanding "consumer note agreements" (represented by Premier to be short-term notes executed by members of its vacation club and payable to it). The business loan agreement provided in substance that Premier's ability to draw down the line of credit at any given time would depend upon a formula that took into account the present value of consumer notes outstanding.

Over the course of the next year, the parties entered into additional agreements that gradually increased the available line of credit. Ultimately, MFI agreed to boost the credit line to $12,000,000, based on DelPiano's representation that Premier held approximately 19,000 consumer notes averaging $4,500 each (90% of which were current). To ensure that the proceeds of those notes would first be applied to pay Premier's debt to MFI, the parties established a so-called lock-box facility, serviced by NCC Business Services and its successor, Noble Enterprises (NCC/Noble). Under this arrangement, NCC/Noble was to receive the payments made by Premier's customers on the consumer notes, deposit the funds into designated accounts, and disburse loan payments to MFI from those accounts as they became due. NCC/Noble would then release any surplus funds to Premier.

As the draw-downs on the line of credit ballooned, MFI became increasingly concerned about the security of its loan. To allay this concern, Premier provided additional collateral in July of 1999. The additional collateral took the form of a financial performance bond underwritten by Sentinel Insurance Company (an independent insurer incorporated under the laws of Bermuda). Shortly after the bond was posted, MFI allowed Premier to exhaust the entire $12,000,000 line of credit.

On October 11, 1999, Premier missed a required payment of $241,000. MFI asked Premier for the funds. When Premier failed to honor its obligation, MFI turned to Sentinel, which defaulted on its bond. Invoking diversity jurisdiction, *see* 28 U.S.C. § 1332(a), MFI then brought suit against Sentinel in the United States District Court for the District of Massachusetts, alleging breach of contract. In short order, MFI added Premier and DelPiano as defendants.[1] Those parties, in turn, took the offensive and sued MFI in a Georgia state court. MFI removed the case to the United States District Court for the Northern District of Georgia, *see id.* § 1441, and asserted counterclaims for fraud, breach of contract, breach of the implied covenant of good faith and fair dealing, and the like. That suit was subsequently transferred to Massachusetts and consolidated with MFI's original action. *See id.* § 1404(a).

---

1. Sentinel entered liquidation proceedings in Bermuda and MFI's claims against it were subsequently reduced to judgment (although MFI has never collected any remuneration). Similarly, MFI has dropped the claims that it asserted early in the litigation against Synergy Capital Management LLC (Sentinel's agent). Neither Sentinel nor Synergy is a party to this appeal.

The case progressed slowly. Much of the delay was attributable to the defendants' foot-dragging vis-à-vis discovery and to a variety of other stalling tactics. While the litigation inched along, the district court issued a pretrial order on April 28, 2003. That order required, inter alia, that each party give notice of any objection to the qualifications of the other parties' experts on or before November 10, 2003. Neither Premier nor DelPiano filed any such objection.

Twenty-four days before the scheduled trial date, the defendants filed an emergency motion to stay the civil action. The motion made vague references to a grand jury investigation of DelPiano and Premier—an investigation that supposedly was "entwined" with MFI's claims against them. Although the defendants voiced Fifth Amendment concerns, the district court summarily denied the motion.

After the defendants unsuccessfully sought shelter in the bankruptcy court, a bench trial commenced. The district court took testimony over two days, reserved decision, wrote a thoughtful rescript, and found in favor of MFI against both defendants on the fraud, contract, and good faith and fair dealing claims. *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, No. 00–10105, slip op. at 13 (D.Mass. Mar. 8, 2004) (unpublished). The court also dismissed with prejudice all the defendants' claims against MFI. *Id.* The court entered judgment for MFI in the amount of $23,000,000 and this appeal followed.

## II. ANALYSIS

On appeal, the defendants assign error to the district court's denial of their motion to stay and to the court's decision to permit the testimony of a financial expert, Gerald Killion, anent the lock-box facility. We consider each remonstrance in turn.

## A. *The Motion to Stay.*

The defendants make two arguments—one procedural and one substantive—concerning the lower court's denial of their motion to stay. We start with their procedural argument: that the district court erred in failing to issue written findings of fact and conclusions of law in connection with its ruling. This argument is jejune.

In staking out this position, the defendants posit that Fed.R.Civ.P. 52(a) requires written findings of fact and conclusions of law in this sort of situation. The rule states in relevant part that "in granting or refusing interlocutory injunctions the court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed.R.Civ.P. 52(a). The defendants suggest that the term "interlocutory injunctions" includes motions to stay. This conveniently capacious interpretation blithely overlooks the rule's admonition that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 *or any other motion* except as provided in subdivision (c) of this rule." *Id.* (emphasis supplied). Subdivision (c) is not relevant to a motion for a stay; it applies only to judgments made on partial findings during a bench trial. *See* Fed.R.Civ.P. 52(c).

The avowed purpose of adding this sentence to Rule 52(a) was to "remove any doubt that findings and conclusions are unnecessary upon decision of a motion." Fed.R.Civ.P. 52 advisory committee's note (1946 amendment). A plain reading of the added language places the defendants' motion for a stay within the category of "any other motion" (for which written findings of fact and conclusions of law are not required).

The case law confirms this intuition. Numerous opinions make a clear distinc-

tion between an injunction and a stay. For example, in holding that the denial of a stay was not appealable under 28 U.S.C. § 1292(a)(1), the Supreme Court stated that "[a]n order by a federal court that relates only to the conduct or progress of the litigation before that court ordinarily is not considered an injunction." *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 279, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988). In the same context of appealability, this court has stated that the grant of a stay pending developments in a parallel action "is neither 'final' nor equivalent to an 'injunction.'" *Acton Corp. v. Borden, Inc.,* 670 F.2d 377, 380 (1st Cir.1982). These decisions reinforce our conclusion that the plain language of Rule 52(a) means what it says.

That ends this aspect of the matter. We hold, without serious question, that the district court did not err in eschewing written findings of fact and conclusions of law in connection with its ruling on the defendants' motion to stay.

■■ This brings us to the substance of the challenged ruling. It is apodictic that federal courts possess the inherent power to stay proceedings for prudential reasons. *Landis v. N. Am. Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936); *Marquis v. FDIC,* 965 F.2d 1148, 1154–55 (1st Cir.1992). The pendency of a parallel or related criminal proceeding can constitute such a reason. *See Hewlett–Packard Co. v. Berg,* 61 F.3d 101, 105 (1st Cir.1995).

■ The decision whether or not to stay civil litigation in deference to parallel criminal proceedings is discretionary. *Acton Corp.,* 670 F.2d at 380. Accordingly, we

review the denial of a motion to stay for abuse of discretion. *Arthurs v. Stern,* 560 F.2d 477, 479–80 (1st Cir.1977). A movant must carry a heavy burden to succeed in such an endeavor. *See Austin v. Unarco Indus., Inc.,* 705 F.2d 1, 5 (1st Cir.1983) (explaining that the movant must demonstrate "a clear case of hardship" to be entitled to a discretionary stay).

■ There is no question that a trial judge can facilitate the appellate task by spelling out his rationale, and we encourage such elaboration. Nevertheless, when a judge grants or denies a motion for which findings of fact and conclusions of law are not required without elucidating his reasoning, a reviewing court ordinarily may assume that the judge gave careful consideration to the motion and weighed the appropriate factors. *See Earnhardt v. Puerto Rico,* 744 F.2d 1, 3 (1st Cir.1984). The failure to set out findings and conclusions in such a situation does not alter the standard of review. *See FDIC v. Ogden Corp.,* 202 F.3d 454, 460 (1st Cir.2000).[2] The court of appeals "will not deem the denial of [the motion] erroneous unless [its] canvass of the record indicates that the trial court indulged in a serious error of law or suffered a meaningful lapse of judgment, resulting in substantial prejudice to the movant." *Correia v. Fitzgerald,* 354 F.3d 47, 52 (1st Cir.2003) (citation and internal quotation marks omitted).

■ In this instance, the defendants argue that a federal criminal investigation was underway and that, therefore, the district court should have deferred. But a defendant has no constitutional right to a stay simply because a parallel criminal

---

**2.** To be sure, we have the power in such a situation to remand for specific findings in order to enlighten appellate review. *See, e.g., Francis v. Goodman,* 81 F.3d 5, 6–7 (1st Cir. 1996). Here, however, the record permits a clear understanding of why the district court ruled as it did. Thus, a remand would serve no useful purpose. *See Ogden Corp.,* 202 F.3d at 460.

proceeding is in the works. *See United States v. Kordel*, 397 U.S. 1, 11, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970) (observing that the Constitution does not provide parties blanket protection from the perils of contemporaneous criminal and civil proceedings). In reviewing a trial court's denial of a stay, we consider whether its decision bespeaks a reasonable squaring of the interests of the parties, the court, and the public. *See Arthurs*, 560 F.2d at 479–80. The touchstone, of course, is that a district court's discretionary power to stay civil proceedings in deference to parallel criminal proceedings should be invoked when the interests of justice counsel in favor of such a course. *See Kordel*, 397 U.S. at 12 n. 27, 90 S.Ct. 763.

■■ That determination is highly nuanced. The decision to grant or deny such a stay involves competing interests. Balancing these interests is a situation-specific task, and an inquiring court must take a careful look at the idiosyncratic circumstances of the case before it. *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C.Cir.1980). Notwithstanding that each instance is sui generis, the case law discloses five factors that typically bear on the decisional calculus: (i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation, including the avoidance of any prejudice to the plaintiff should a delay transpire; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) the interests of third parties; and (v) the public interest. *See, e.g., Fed. Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 903 (9th Cir.1989); *Arden Way Assocs. v. Boesky*, 660 F.Supp. 1494, 1496–97 (S.D.N.Y. 1987); *Digital Equip. Corp. v. Currie Enters.*, 142 F.R.D. 8, 12 (D.Mass.1991). To this list we add (vi) the good faith of the

litigants (or the absence of it) and (vii) the status of the cases.

Here, MFI had an obvious interest in proceeding expeditiously. The defendants had procrastinated throughout, and further delay quite likely would have caused prejudice. After all, the default that triggered this litigation occurred on October 11, 1999, and MFI brought suit within a matter of months thereafter; since that time, Premier's business had become moribund and MFI's prospects of recovery were ebbing. The passage of over three years, particularly in view of the large amount in controversy, suggests a need for some celerity. *Cf. Molinaro*, 889 F.2d at 903 (affirming denial of stay when civil action had been pending for a year); *Austin*, 705 F.2d at 5 (upholding denial of stay when plaintiff would have suffered the financial risk of waiting an uncertain and potentially lengthy period of time before being able to collect any ensuing judgment from financially strapped defendants).

The defendants' caterwauling about the onus of conducting a civil trial during the pendency of a federal grand jury investigation rings hollow. Although they focus this argument on the burden imposed on DelPiano's Fifth Amendment rights, the fact remains that during civil discovery, DelPiano freely gave lengthy deposition testimony regarding the events underlying MFI's claims. He also composed and signed a detailed affidavit in opposition to MFI's motion for summary judgment. These choices have consequences. By failing to invoke his Fifth Amendment privilege, he likely waived the privilege with respect to the subject matter of his deposition testimony for the duration of the proceeding in which that testimony was given. *United States v. Gary*, 74 F.3d 304, 312 (1st Cir.1996). A party who chooses to testify in a civil case in spite of the risk that a prosecutor later might seek to use

his statements against him in a criminal prosecution involving the same subject matter is hard put to complain about the subsequent denial of a stay. *See generally* Milton Pollack, *Parallel Civil and Criminal Proceedings,* 129 F.R.D. 201, 205–06 (1989) (explaining how a party's participation in civil proceedings may affect his position in parallel criminal proceedings). When all is said and done, a stay cannot preserve what a defendant already has surrendered. *See Molinaro,* 889 F.2d at 903 (noting that the burden on defendant's Fifth Amendment rights was negligible because he already had given deposition testimony in the civil proceeding).

Next, we note that the motion for a stay failed to provide the court with any indication that an indictment was imminent. It stated only that the United States Attorney for the District of Massachusetts had advised the movants that they were subjects of a grand jury investigation. The fact that no indictment had been handed up furnishes further reason to discount the burden on the movants.[3] Although the possibility of an indictment may make a defendant's position in civil litigation more precarious, the difficulty is less acute than it would be if an indictment actually existed. *See id.* While pre-indictment stays of parallel civil proceedings occasionally have been granted, *see, e.g., United States v. 1344 Ridge Road,* 751 F.Supp. 1060, 1062 (E.D.N.Y.1989), an unindicted defendant who argues that going forward with a civil proceeding will jeopardize his Fifth Amendment rights usually presents a much less robust case for such extraordinary relief. *Dresser Indus.,* 628 F.2d at 1376. Here, the case is weakened further because the defendants' motion papers did not inform the court of when the investigation started, how long it was expected to last, or any other facts that might tend to suggest that an indictment was more than a remote possibility.

The next factor—the court's convenience—is deserving of substantial weight. We frequently have recognized that "trial judges must work a complicated equation, balancing fairness to the parties with the need to manage crowded dockets." *Macaulay v. Anas,* 321 F.3d 45, 51 (1st Cir. 2003). By the same token, trial judges "tend to have an intimate knowledge of the variables that enter into that equation." *Id.* For that reason, we consider decisions that implicate the court's calendar and convenience "with a deferential mien." *Thibeault v. Square D Co.,* 960 F.2d 239, 242 (1st Cir.1992). At the time the motion was made, this case was on the brink of trial. It had been pending for over three years and the court had an interest in moving it along, especially since the defendants were, in effect, asking to stay proceedings for an indefinite (and potentially protracted) period. To cinch matters, the foot-dragging that already had occurred gave the court good reason for skepticism about the requested stay.

There is little more to say about this ruling.[4] Balancing the relevant factors, we conclude that the district court acted well within its discretion in determining that the trial should go forward without further delay.

## B. *Admission of Expert Testimony.*

The defendants also asseverate that the district court erred in permitting MFI's

---

3. For aught that appears, no indictment has ever been returned.

4. The motion to stay in this case does not seem to implicate the interests of third parties or of the public to any significant extent. We mention only the presumption that the public has an interest in prompt resolution of civil cases. *See* Fed.R.Civ.P. 1. Here, the defendants have offered nothing to offset that presumption.

expert witness, Gerald Killion, to testify regarding the operation of the lock-box accounts. Specifically, they contend that the court's decision contravened the requirement that an expert witness be qualified and that he base his opinions on sufficient facts or data. *See* Fed.R.Evid. 702.

Ordinarily, we review evidentiary determinations of this sort for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Here, however, the defendants failed to assert a proper and timely objection before the nisi prius court. Consequently, we limit our consideration of their forfeited challenge to plain error.[5] *See Chestnut v. City of Lowell*, 305 F.3d 18, 20 (1st Cir.2002) (en banc) (per curiam); *see also* Fed.R.Evid. 103(a).

██ In all events, neither aspect of the defendants' challenge seems substantial. They maintain for the first time on appeal that Killion was not qualified to testify as an expert with respect to the lock-box accounts because he lacked direct experience in dealing with such accounts. The record reveals no basis for faulting Killion's qualifications, let alone any shortcoming so glaring as to affect the defendants' substantial rights. *See United States v. Duarte*, 246 F.3d 56, 60 (1st Cir.2001) (reciting the requirements for finding plain error).

The short of it is that Killion had served as an agent for the Internal Revenue Service for thirty-three years. He had spent most of that time as part of a specialized team that investigated financial fraud. His testimony at trial comprised an analysis of Premier's financial transactions, including the flow of funds lent by MFI to Premier into the lock-box accounts designated for consumer note payments. Killion opined that structuring the transactions in that way was fraudulent—and he explained the basis for that opinion in excruciating detail.

██ The defendants' chief complaint seems to be that Killion had no previous experience with lock-box accounts per se. That complaint fails for two reasons. First, Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (noting that the Rule 702 inquiry is "a flexible one"). When, as in this case, an expert is "qualified ... by knowledge, skill, experience, training, or education," Fed.R.Evid. 702, he need not have had first-hand dealings with the precise type of event that is at issue. *See, e.g., Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 31 (1st Cir.2000) (upholding district court's allowance of sea captain's expert testimony despite captain's lack of familiarity with the particular type of vessel on which plaintiff's injury took place).

At any rate, the defendants' emphasis on the lock-box accounts is a smokescreen. "Lock-box" is merely a euphemism to describe certain limited-access accounts set up to achieve a particular purpose (here, to guide consumer note payments into a secured lender's hands). Killion's testimony

---

**5.** Forfeiture perhaps overstates the defendants' rights. They not only failed to object to Killion's qualifications at trial but also failed to serve an objection as required by the pretrial order. A strong argument can be made that the objection has been waived (and, thus, is not cognizable at all). *See United States v.*
*Rodriguez*, 311 F.3d 435, 437 (1st Cir.2002) (distinguishing between waiver and forfeiture); *cf. Rosario–Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir.1998) (warning that "a litigant who ignores a case-management deadline does so at his peril").

did not deal with the esoterica of lock-box accounts, but, rather, with the tracking of funds into and out of the NCC/Noble lockbox accounts. That sort of point-to-point tracking fell within the heartland of Killion's expertise. Accordingly, allowing him to testify as an expert was not erroneous.

The defendants next attack Killion's testimony that they enacted a Ponzi scheme in which the funds that they borrowed from MFI were disguised as consumer note payments, recycled, and used in part to repay the loans owed to MFI. Specifically, the defendants allege that Killion lacked a sufficient factual foundation for this opinion. The gist of this allegation is that Killion only looked at bank records supplied by MFI and that his conclusion was not informed by the activity taking place in *all* of NCC/Noble's accounts.

Here too we restrict our review to plain error because the defendants failed to preserve this point below. Although their counsel did call out the word "objection" twice during the course of Killion's testimony, he did not identify the basis for his objection on either occasion. Unless the basis for an objection is obvious—and that was not so here—a party must state the specific ground for objection in order to preserve that ground for appeal. *See* Fed. R.Evid. 103(a) (requiring counsel to "stat[e] the specific ground of objection, if the specific ground [is] not apparent from the context" in order to predicate error on an evidentiary determination); *see also United States v. Diaz,* 300 F.3d 66, 75 (1st Cir.2002) (holding that counsel's generic references to *"Daubert"* and to competency were "woefully deficient for the purpose of advising the district court that [the objecting party] was raising a challenge to the reliability of the experts' methods and the application of those methods under Rule 702").

We find nothing remotely warranting a finding of plain error here. The objection regarding the scope of Killion's investigation of the accounts goes to the weight, not the admissibility, of his testimony. *See, e.g., Int'l Adhesive Coating Co. v. Bolton Emerson Int'l,* 851 F.2d 540, 545 (1st Cir. 1988) ("When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury."). And, moreover, the question that elicited Killion's opinion on direct examination asked only for "what is indicated by the activity that you analyzed from the bank accounts." Thus, there could not have been any confusion about the foundation for Killion's opinion.

## III. CONCLUSION

We need go no further. Discerning no abuse of discretion with regard to the district court's denial of the motion for a stay and no plain error with regard to its evidentiary determinations, we uphold the judgment in favor of MFI.

*Affirmed.*