# United States Court of Appeals
## For the First Circuit

No. 03-2019

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD J. SCHNEIDERHAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin and Stahl, Senior Circuit Judges.

Robert L. Sheketoff, by Appointment of the Court, for appellant.
William J. Nardini, Special Attorney, with whom Michael J. Sullivan, United States Attorney, and John H. Durham, Special Attorney, were on brief for appellee.

April 13, 2005

**COFFIN, <u>Senior Circuit Judge</u>.** This case is an offshoot of the prosecution of members of the notorious Boston Winter Hill Gang for various crimes including extortion and murder. One of the defendants in that prosecution, James "Whitey" Bulger, was later elevated to the Top Ten Most Wanted List; he remains, after nearly ten years, a fugitive. Defendant-appellant in this case, Richard J. Schneiderhan, a retired Massachusetts State Police lieutenant, was convicted of conspiracy to obstruct justice and obstruction of justice, in violation of 18 U.S.C. §§ 371 and 1503. He was prosecuted for communicating to a criminal associate of James Bulger the decision of federal law enforcement authorities to conduct electronic surveillance of Bulger's two brothers, John and William, via pen registers placed on their telephones.

The primary issue at trial and in this appeal is whether defendant had the requisite intent to obstruct justice when he provided the information. He asserts three claims of error. His major challenge is to the district court's denial of a motion for new trial based on the failure of the prosecution to disclose in timely fashion an allegedly exculpatory letter that related to a trial witness's testimony, in violation of <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500. He also argues that the court erred in allowing two witnesses to give testimony that he alleges constituted impermissible opinion evidence as to defendant's mental state, in violation of Fed. R.

Evid. 704(b).  A final issue raised in the wake of <u>Blakely</u> v. <u>Washington</u>, 542 U.S. ___, 124 S. Ct. 2531 (2004), and <u>United States</u> v. <u>Booker</u>, 543 U.S. ___, 125 S. Ct. 738 (2005), is whether defendant is entitled to re-sentencing as a result of the court's plain error in adjusting his sentence upward under the mandatory Sentencing Guidelines.

Our review persuades us that, in the final analysis, these arguments lack merit.

## I. <u>The Brady and Jencks Act Issues</u>

<u>Factual background</u>.  We first review the facts relevant to the government's alleged failure to disclose a significant letter in timely fashion.  We draw the facts from the evidence presented at trial.

Defendant had a longstanding friendship with one Stephen Flemmi, a member of the Winter Hill Gang.  After Flemmi was incarcerated as the result of the prosecution of gang members, defendant kept in touch with him and another gang member who was not then in prison, Kevin Weeks.  Weeks had learned from James Bulger and Flemmi that defendant had done many favors for the gang in providing information.  Weeks and defendant met perhaps a dozen times, defendant hoping that Weeks would be of some help to Flemmi and consequently wanting to be of help to Weeks.

In late September 1999, defendant was able to do something. Whether that "something" was really intended to be helpful or was

just a pretense is the issue underlying defendant's claim regarding the withheld letter. At that time, James Bulger was still at large more than three years after the Winter Hill Gang indictments, and he was newly placed on the Top Ten List. The government adopted a broad investigative strategy that included orders from a "Ted Baker at FBI" to place pen registers on three telephones of William and John Bulger. Those work orders were channeled through the computer of Linda Reardon, a telephone company employee who also was the daughter of defendant's brother-in-law, Edward Duff.

Winter Hill Gang member Weeks, testifying under a cooperation agreement, said that on a Thursday in late September 1999 he received an envelope that defendant had left for him at the Rotary Variety Store, a locale frequented by gang members and their associates. The envelope contained a typewritten note, which said that a Tom Baker had put wiretaps on two phones the day before, and listed the telephone numbers. At the bottom was typed "131313, Max," a number and name previously used by defendant to identify himself in his dealings with Weeks. Weeks called John Bulger, who confirmed the accuracy of the telephone numbers.

Over six months later, acting on information from Weeks and others, Massachusetts State Police Officers Thomas Duffy and Thomas Foley interviewed defendant, who acknowledged writing to Flemmi and meeting with Weeks. When told that Weeks had indicated that he was the source of wiretap information, defendant initially protested

that he would have had no way of knowing such information. Later in the conversation, he revealed that John and William Bulger were the targets of the surveillance, although this fact had deliberately not been communicated by the officers. Defendant, when asked how he knew about the targets, first asserted that he learned this from the two officers but quickly withdrew this answer and said he had assumed the fact. In a second interview, held two days later, defendant admitted leaving the typed note with its identifying signatures and said he had received the information from his brother-in-law Duff.

Defendant's testimony as to motive. What we have recounted thus far described what happened. What follows is a summary of defendant's testimony at trial about the motives for his actions and his knowledge of the source of his information. It is a remarkable tale of shifting, if not contradictory, emphases. He first explained he had remained in contact with Weeks in the hope that he might learn something about James Bulger's whereabouts and reap a substantial reward. Later, he dismissed this as sarcasm.

Then he described how William Bulger had helped defendant and others by supporting the listing of their church as a national monument. He felt, he said, a "great obligation" to William. This testimony was followed by statements that he had not helped Weeks recently, that Weeks was "getting a little bit hinky" about talking to him, and that he, defendant, wanted to "throw him a

bone." Later, however, he described this explanation as "a little facetious." Following up on his "bone" motive, defendant said that William would not talk on the telephone to his brother James and that everybody knew that James did not talk on the telephone, so "I knew it wasn't going to cause any damage." Moreover, oddly, he said he did not really believe that there were taps ("a thing") on William's and John's phones.

His testimony about the source of his information was equally vacillating. First, in reporting his brother-in-law's call from Florida with the tip about electronic surveillance, he said he did not know where the information had come from but merely "assumed" where it had, without saying what his assumption was. Shortly thereafter, he said that the information he passed to Weeks was "just golf course or barroom gossip . . . just stories."

On the following day of trial, the government inquired about defendant's niece, Linda Reardon. Defendant had earlier disavowed knowing that she was employed by the telephone company, saying, "I knew a group of the family were employed there, but I didn't know specifically who was what." Under cross-examination, he testified as follows:

> Q. The information from Duff [defendant's brother-in-law]? He got it from his niece [sic] Linda Reardon, and you gave it then to Kevin Weeks, right?
>
> A. I don't know that he got it from his daughter Linda. I was told that he got it from her, but of my own knowledge, I don't know.

-6-

Defendant admitted giving the information to Weeks and expecting that he would in turn give it to John and William Bulger.

The undisclosed letter. Against this factual background we must assess the relevance of a letter that was not disclosed prior to trial, whether the letter was exculpatory, and, finally, whether its non-disclosure was prejudicial. See Brady, 373 U.S. at 87-88. Under the Jencks Act, our inquiry focuses on whether the letter was a statement of a witness relating to the witness's trial testimony. See 18 U.S.C. § 3500(b).

The letter at issue was written by then Assistant United States Attorney David Apfel, who had been associated with the prosecution of gang members and the search for James Bulger from 1994 through 1998. The letter was dated October 9, 1998, a year earlier than the events detailed in this case. It was written to the attorney then representing William Bulger in connection with Bulger's possible proffer of information or appearance before the grand jury. It assured counsel that William would not face questions based on a Title III wiretap but would be asked questions based on information obtained from "telephone pen registers and trap and trace devices, as well as from terminating number searches." Defendant asserts that the 1998 letter reveals that any information he may have communicated in 1999 about electronic surveillance was harmless because the Bulgers already knew about it.

In a grand jury appearance in 2001, William said he knew there had been a wiretap on his telephone and thought his counsel had given him that information. He did not know whether it was a wiretap or a pen register, but assumed both. The district court held that that testimony, which was available to defendant, gave him specific information about the same subject matter covered in Apfel's letter, thus precluding any material prejudice. The court also held that, by asserting that his actions had no impact, defendant was raising the impermissible defense of factual impossibility, and the court further ruled that defendant had failed to exploit available witnesses on the issue – specifically Weeks and William Bulger. Finally, it held that the Jencks Act was not violated because no showing was made that Apfel's letter was a statement about matters material to the testimony Apfel had given in defendant's trial.

Argument and Analysis. We generally will reverse the denial of a motion for new trial only if there is a "manifest abuse of discretion," United States v. Glenn, 389 F.3d 283, 287 (1st Cir. 2004), and a district court's determination that information is neither exculpatory under Brady nor discoverable under the Jencks Act is similarly subject to abuse-of-discretion review, United States v. Rosario-Peralta, 175 F.3d 48, 55 (1st Cir. 1999). The criteria for finding a Brady violation are: (1) a wilful or inadvertent suppression of evidence by the government, (2) the

-8-

evidence being favorable to the defendant, (3) resulting in prejudice to the defendant so serious that there is "a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281-282 (1999); see United States v. Josleyn, 206 F.3d 144, 153 (1st Cir. 2000). This does not mean that a verdict would have been "'more likely than not'" different, but that, without the evidence, defendant did not receive a trial "'resulting in a verdict worthy of confidence.'" Strickler, 527 U.S. at 289-90 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

The Jencks Act requires the government to provide, upon request, certain prior statements made by trial witnesses, and our review turns on the statutory requirement that the statement "relate[] to the subject matter as to which the witness has testified," 18 U.S.C. § 3500(b). Again, a demonstration of prejudice is necessary. United States v. Nelson-Rodriguez, 319 F.3d 12, 35 (1st Cir. 2003).

On appeal, defense counsel seeks to characterize the 1998 Apfel letter as an admission by the government that pen registers were a well known component of the Winter Hill Gang investigation, supporting defendant's contention that his communication to Weeks in 1999 was not intended to be of consequence. Defendant refers in his brief to "the government's myth that no law enforcement officer under any imaginable circumstance would ever breathe a word about

-9-

electronic surveillance in order to avoid flushing it's [sic] usefulness down the toilet," and asserts that the jury "should have learned that by October 9, 1998, even the federal prosecutors had abandoned the secrecy shill."  In oral argument, appellate counsel passionately elaborated on that theme:  "I wasn't given a chance to put David Apfel's letter down his throat . . . .  I could have tortured him for a couple of hours about that letter."  He further noted that for the government to put pen registers on the brothers' phones in 1999 is "almost laughable as a realistic attempt" to track down James.

There are several problems with this argument.  Perhaps the most important is that the argument blithely ignores the gulf separating the kind of information he was convicted of passing on to Weeks and that described in the Apfel letter.  The latter was a statement, made a year before appellant's action, that the government "has obtained" information from unidentified pen registers, trap and trace devices, and terminating number searches.  In other words, not only is the reference to past activity, but it is a general reference to several investigative techniques employed by the government without identifying the targeted telephones.

In contrast, defendant was charged with and convicted for passing on information that electronic surveillance devices had just been installed on the telephones of two named individuals.  It was the harm done to law enforcement investigations by this kind of

almost contemporaneous release of specific information concerning targets of electronic surveillance that was the subject of the testimony of all the government's witnesses.[1]  At no point does defendant in either his brief or oral argument acknowledge the difference between the information contained in the Apfel letter and the specific target information referred to by the government witnesses.  We fail to see how nondisclosure of the Apfel letter suppressed evidence that could be considered exculpatory.

Beyond this, we note that defendant's claim that he was merely passing on gossip would have been seriously flawed even had the letter been available.  First, this particular argument was the last of a number of asserted motives, most of which contradicted it.  For example, were worthless gossip all that was communicated, there would be little prospect of a substantial reward resulting from such information, or even the prospect of building up credit with Weeks for some future bonanza tip about James's whereabouts.  If, as appellate counsel argued, no reasonable person with any experience could believe that release of electronic surveillance information would be of value, such a "bone" would hardly be deemed

_____

[1] The following seven witnesses all testified that the harm lay in identifying the particular targets of ongoing electronic surveillance: former Assistant United States Attorney Apfel; FBI Agent Thomas Larnard; former FBI Agent Robert Parisien; Massachusetts State Police Major Duffy; Massachusetts State Police Colonel Foley; retired Massachusetts State Police Lieutenant Robert Long; and former NESPIN (New England State Police Information Network) Director Kenneth McBride.

worth gnawing by such a seasoned criminal associate as Weeks. Similarly, mere gossip would be no way of responding to the heavy obligation he assertedly felt toward William because of past favors.

Moreover, on the record we have set forth, see supra at 6, the guilty verdict is consistent with the jury's belief that defendant acted on his assumption and understanding that the source of the information was his niece, Linda, reporting the order for pen registers that came through her computer. See United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003) ("[T]he jury's duty is to assess credibility, and it may accept or reject, in whole or in part, any testimony."). Such a permissible inference shatters the "golf course gossip" theory.

Our conclusion with respect to the Brady claim is thus threefold. First, we cannot consider the belatedly produced Apfel letter to be exculpatory for defendant because of its irrelevance to a communication of specific, current, highly confidential police surveillance. Second, we deem defendant's effort to substitute a "worthless gossip" motive for that of obstruction of justice to be unhelpful to him - and therefore not exculpatory - because it is internally inconsistent with his own testimony as to the basis of his action. Finally, we hold that in any event defendant has made no showing that admission of the Apfel letter "could reasonably be taken to put the whole case in such a different light as to

-12-

undermine confidence in the verdict," Josleyn, 206 F.3d at 156 (quoting Kyles, 514 U.S. at 435). The ruling of the district court, therefore, falls far short of any abuse of discretion.

Our decision on the Jencks Act issue is determined by what we have said about the basic difference between the generalized notice in the Apfel letter and an unauthorized release of information about electronic surveillance currently in place. Apfel's testimony at trial was confined to a description of the electronic surveillance procedure, the particular pen registers at issue, and the purpose of sealed orders to keep such surveillance secret. The letter was not relevant to that testimony. Finally, as in our analysis of the Brady issue, the evidence in its totality renders any Jencks error harmless. See United States v. Neal, 36 F.3d 1190, 1199 (1st Cir. 1994). Indeed, defendant makes no attempt to demonstrate prejudice.

We therefore affirm the district court's denial of the motion for new trial.

## II. Admission of Testimony as to Mental State

Background. Defendant's second asserted error is that the district court improperly allowed two law enforcement witnesses to opine that someone experienced in dealing with organized crime would know that revealing the existence of electronic surveillance to a target would compromise the investigation. Other testimony

-13-

established that defendant had such experience.  See infra at 17-18.

Defendant invokes Rule 704(b) of the Federal Rules of Evidence, which prohibits an expert witness from testifying that a "defendant did or did not have the mental state or condition constituting an element of the crime charged."  He cites our opinion in United States v. Valle, 72 F.3d 210, 216 (1st Cir. 1995), where we held that Rule 704(b) prohibited "direct expert testimony" concerning a defendant's intent if intent was an element of the crime charged.  This bar does not, however, apply to "predicate facts from which a jury might infer such intent," id., and we therefore held that an officer properly testified that the quantity of drugs found was more indicative of intent to distribute than to keep for personal use, id.

Defendant asserts that in this case the line was crossed when FBI Agent Larnard and Major Duffy of the Massachusetts State Police were allowed to answer the following questions:

> To FBI Agent Larnard: Would it be fair, sir, that any law enforcement officer who had been involved in, say, organized crime investigations and the like, if he had the information about a pen register and went and gave it to the targets of the investigation itself, the pen registers themselves, would know, would he not, that he's compromising your investigation?
>     Mr. DUGGAN (trial counsel for defendant): Objection.
>     THE COURT: Overruled.
>     A. Yes, sir.
>
> To Major Duffy: So if you worked for ten years in the Attorney General's Organized Crime Unit and they were doing organized crime cases and using electronic

surveillance, would you know the damage that you were doing to somebody else's investigation if you leaked that electronic surveillance information to the targets of the investigation?

MR. DUGGAN: Objection.

THE COURT: Overruled.

A. I think you would be extremely cognizant of the ramifications of a breach of that nature.

_Analysis_.  The government first reminds us that we give "a wide berth" to such trial judgments as rulings under Rule 704, reviewing them only for abuse of discretion.  See  _Valle_, 72 F.3d at 214.  It then advances four positions.  The first is that this evidentiary issue was not preserved by the invocation of the single word, "objection."  It cites our recent opinion in _Microfinancial, Inc._ v. _Premier Holidays Int'l, Inc._, 385 F.3d 72, 81 (1st Cir. 2004).  While we acknowledged the general need for more explanation than calling out "objection," Rule 103 of the Federal Rules of Evidence notes a caveat: "if the specific ground was not apparent from the context."  In this case, we think it close to the line whether the basis for objection was understood by all.  We therefore resist the government's invitation to rule on this point.[2]

A second argument of the government was that the questions were quite proper, since they did not actually refer to the intent of the defendant, but simply described "the common practices of

---

[2] Even were we to accept the government's position, it would not mean an end to our inquiry.  Our view would then be for plain error. See _Microfinancial_, 385 F.3d at 81.

-15-

those who clearly do possess the requisite intent."  In so arguing, the government quotes United States v. Lipscomb, 14 F.3d 1236, 1239 (7th Cir. 1994), but the court there clearly defined the limit of admissibility to be testimony as to the modus operandi of a crime. We have found no authority treating expert testimony as to what a similarly situated officer might or might not know in the same manner as "common practices."  Here again, we prefer not to rule on the issue.

A third contention of the government is that the testimony concerning defendant's knowledge is admissible because the crime with which defendant was charged is obstruction of justice, which involves purpose, or specific intent, "while 'knowledge' corresponds loosely with the concept of general intent," United States v. Bailey, 444 U.S. 394, 405 (1980).  This is an ingenious argument, but the actual testimony here strays close to the line of proof of purpose.  See United States v. Smart, 98 F.3d 1379, 1385-89 (D.C. Cir. 1996) (testimony avoiding use of "intent" to distribute drugs but saying that defendant "met the elements" of a commercial drug dealer held impermissible where the elements of a hypothetical question were a carbon copy of defendant's circumstances).  As in Smart, the questions objected to here approach carbon copy similarity to defendant's background.  Again, we see no need to venture into this kind of fine line drawing.

-16-

The government's fourth argument - that any error in admitting these two sets of questions and answers was harmless - seems clear beyond any doubt.  We first observe that both were very brief exchanges in the course of five days of testimony in which seven witnesses from the law enforcement community, see supra note 1, testified to the importance of keeping information about ongoing electronic surveillance from the targets.

In addition, a scrutiny of the context in which the allegedly improper testimony took place reveals the strong unlikelihood of prejudice.  FBI Agent Larnard had been asked, immediately before the exchange we have quoted, this question:

Q.    And based on your experience in law enforcement, is the utility or the importance of keeping such investigative tools or use of the tools confidential important to anybody who has had experience in law enforcement?
A.    Of course.

In other words, virtually the same information objected to had just been elicited without any protest.  Even though we have in this case refrained from declaring a forfeiture of the issue through voicing simply "objection," we resist going farther down this road.  While we have considered the issue, we also view the prior unobjected to testimony as going far toward removing any prejudice from what followed.

The context leading up to Major Duffy's challenged exchange is even more revealing of its lack of significance.  Major Duffy had served for many years with the Organized Crime Unit of the

-17-

Massachusetts State Police. He knew that defendant had served in a similar unit at the Attorney General's office for about ten years, from 1968 to 1978, had risen to the post of chief intelligence officer of that unit, and had acquired a reputation as "somewhat of an expert" on organized crime matters in Massachusetts. The Organized Crime Unit, said Duffy, was "one of the predominant units of the State Police involved in electronic surveillance, then and now." Immediately following this last statement came the objected-to question. The answer was, to say the least, opaque: "I think you would be extremely cognizant of the ramifications of a breach of that nature."

In sum, the Larnard exchange was not only brief and unelaborated, but came only after substantially the same opinion had been delivered moments before. And the Duffy exchange came only after a wealth of information that pointed powerfully to defendant's knowledge, and consisted of an answer that was cloaked in obscurity.

Not only does our review of the record as a whole reveal an abundance of evidence pointing to the clear unlikelihood that defendant was innocent of any obstructive motive in passing on the pen register information to Weeks, but there is an absence of exculpatory evidence. Thus, we cannot avoid the conclusion that, in the event that the two answers should not have been permitted, such error would have been harmless.

## III. The Blakely/Booker Issue

In his original brief, defendant asked us to revisit two enhancements of his sentence that were not alleged in the indictment or found by the jury. One was a two-level adjustment for obstruction of trial proceedings by false testimony; the other was a one-level increase based on the court's conclusion that defendant was an accessory after the fact to a James Bulger extortion. These assessments produced a guideline range of 18 to 24 months. The district court sentenced the defendant to the low end of the range, rejecting defendant's request for a downward departure based on medical issues. The court stated:

> I recognize my authority under United States v. Koons and provisions of the Guidelines concerning defendant's medical issues, but I find that it is not appropriate in the circumstances of this case to depart downward in view of the seriousness of the offenses of which the jury has found the defendant guilty and the absence of any expression of genuine remorse for the commission of the crime.

At the invitation of the court, following the Supreme Court's decision in Booker, 543 U.S. at ___, 125 S. Ct. at 738, both parties filed supplemental briefs. Defendant argued that his case should be remanded for re-sentencing, in part based on the same medical issues raised before the district court; the government predictably responded that he failed to establish his entitlement to such a remand. It is undisputed that a plain error standard applies, and that our holding in United States v. Antonakopoulos, 399 F.3d 68 (1st Cir. 2005), thus governs. We there held that, to

-19-

warrant a remand for re-sentencing, a defendant must demonstrate "a reasonable probability" that the district court would impose a sentence more favorable to the defendant under the new advisory guidelines scheme.  <u>Id.</u> at 75.

Defendant has failed to satisfy that burden.  First, as quoted above, the district court rejected the possibility of granting a downward departure based on defendant's medical issues.  The court indicated that it was not constrained by the mandatory nature of the Guidelines, but stated that the severity of the crime and defendant's lack of remorse rendered leniency inappropriate.

In an attempt to inject a new consideration into the mix, defendant cites a factor "not articulated at the sentencing hearing," namely, the sentencing disparity between defendant and his co-defendants.  The co-defendants – defendant's brother-in-law and niece – were not, however, similarly situated.  Both pleaded guilty to obstructing justice, eliminating the "lack of remorse" rationale that influenced the sentence imposed on defendant.  Moreover, the court found that defendant testified falsely during trial.  In these circumstances, we think it evident that the district court would not have reduced defendant's sentence  for the purpose of eliminating disparity.

In the absence of any "specific facts" showing that he was prejudiced by the district court's error, <u>see</u> <u>Antonakopoulos</u>, 399

F.3d at 80, we have no basis upon which to order a remand for re-sentencing.

We therefore AFFIRM the district court's rulings.