# United States Court of Appeals
## For the First Circuit

No. 07-1463

DENISE CROWE,

Plaintiff, Appellant,

v.

ROBERT C. MARCHAND, M.D.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, Senior U.S. District Judge]

Before

Lipez, Circuit Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

Kris Macaruso Marotti, with whom Thomas A. Tarro, III and The Law Firm of Thomas A. Tarro, III, Esq. were on brief, for appellant.
Jason C. Preciphs, with whom Roberts, Carroll, Feldstein & Peirce was on brief, for appellee.

October 19, 2007

**SELYA**, **Senior Circuit Judge**.  In this medical malpractice action, brought under diversity jurisdiction, 28 U.S.C. § 1332(a)(1), plaintiff-appellant Denise Crowe charged an orthopedic surgeon, defendant-appellee Robert C. Marchand, with negligent diagnosis and treatment.  A jury found in favor of the defendant.  The plaintiff now appeals, complaining of both the admission of certain expert testimony and the denial of her motion for a new trial.  Discerning no error, we affirm.

The background facts are straightforward.  On October 20, 2002, the plaintiff, while in Rhode Island, was involved in a rollerblading accident.  She sustained an injury to her right wrist and went to the emergency room of a nearby hospital.  X-rays were taken.

The following day, the plaintiff was seen by the defendant in his private office.  After studying the x-ray films, the defendant diagnosed the plaintiff's injury as a nondisplaced extraarticular distal radius fracture.  He placed her wrist in a volar splint and advised her to return for further evaluation in a few weeks.

The plaintiff revisited the defendant's office on November 5, complaining of swelling and "popping" in her wrist.  A physician's assistant employed by the defendant examined her and took a new set of x-rays.  These studies showed the fracture in satisfactory alignment but suggested a small widening of the

-2-

scapholunate joint (a finding indicative of possible ligament damage). A magnetic resonance imaging (MRI) study was conducted four days later. That study revealed a scapholunate ligament tear in addition to the fracture.

The defendant saw the plaintiff on November 14. While his notes suggest that they discussed the possibility of reconstructing the ligament, he ultimately recommended "conservative treatment" of the injury and prescribed physical therapy. Although a course of physical therapy ensued, the plaintiff continued to complain of persistent pain, edema, and tightness in the wrist.

As time went by, the physical therapist reported that the plaintiff was developing reflex sympathetic dystrophy (RSD). This condition, typically associated with distal radius fractures, causes pain and stiffness. It can lead to a permanent loss of function in the affected wrist.

X-rays taken in December again showed a widening of the scapholunate joint. The defendant, however, was primarily concerned with the plaintiff's RSD symptomatology. He continued to prescribe physical therapy, supplemented by antidepressants, in each of the plaintiff's subsequent visits.

By April of 2003, the plaintiff's RSD symptoms still had not subsided. She then saw Dr. Edward Akelman, a renowned hand surgeon. Dr. Akelman operated on the plaintiff's wrist in May of

that year to repair the ligament tear. This surgery consisted in part of a scaphocapitate fusion of the wrist, which left the plaintiff with a permanent loss of half the movement of the wrist joint.

Displeased by her care at the hands of the defendant, the plaintiff, a citizen of Kansas, brought suit in Rhode Island's federal district court. She alleged, in substance, that the defendant had failed correctly to diagnose and treat the scapholunate ligament tear. In particular, she calumnized the defendant's decision to eschew prompt surgical intervention in favor of treating her injury "conservatively." As she saw matters, this decision fell below the applicable standard of care and led directly to the permanent loss of mobility in her wrist and hand. The defendant denied the material allegations of the complaint and steadfastly maintained that no negligence had occurred.

Medical malpractice cases often turn into battles between dueling experts, and this case followed that well-worn path. In an effort to establish that the defendant had breached his duty of care, the plaintiff presented the testimony of Dr. Leo Rozmaryn. Dr. Rozmaryn testified that the ligament tear should have been operated on quickly and that a "primary repair" of the ligament, if undertaken within six weeks of the accident, would significantly have reduced the ensuing loss of motion. Dr. Rozmaryn further testified that although the defendant had not diagnosed the

ligament tear until he saw the results of the MRI, that tear was easily discernible three weeks earlier (in the October 20 x-ray films).

To counter Dr. Rozmaryn's testimony, the defendant called his own expert, Dr. Bruce Leslie. The plaintiff objected to Dr. Leslie's testimony on the ground that the witness's opinions lacked a reliable foundation. Elaborating, the plaintiff explained that Dr. Leslie had not reviewed any of the pertinent x-ray or MRI studies but, rather, had based his opinions on other physicians' reports of what these studies showed. The district court overruled the objection, indicating that the witness's failure to scrutinize the original x-ray and MRI films could be taken up on cross-examination.

Dr. Leslie testified, in substance, that the defendant had adhered to the applicable standard of care in the diagnosis and treatment of the plaintiff's injury. He further opined that, in light of the plaintiff's incipient RSD, performing a primary repair of the ligament in the time frame suggested by Dr. Rozmaryn would have worsened the plaintiff's condition, not ameliorated it.

When all was said and done, the jury returned a take-nothing verdict. The district court subsequently denied the plaintiff's motion for a new trial. This timely appeal followed.

The plaintiff's principal argument concerns the district court's decision to permit Dr. Leslie to testify. She asserts that

because Dr. Leslie failed to inspect the x-ray and MRI films and instead relied upon other doctors' reports of what those films revealed, he lacked a sufficient factual foundation for his opinion testimony. We examine this assertion.

The Federal Rules of Evidence afford district courts substantial latitude in the admission or exclusion of opinion evidence. Consequently, we review a district court's decision regarding the admissibility vel non of expert testimony solely for abuse of discretion. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997); United States v. Maxwell, 254 F.3d 21, 25 (1st Cir. 2001).

The touchstone for the admission of expert testimony in federal court litigation is Federal Rule of Evidence 702. This rule, by its terms, states that an expert, in order to supply opinion testimony, must be "qualified . . . by knowledge, skill, experience, training, or education" and must possess specialized knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In addition, the rule requires that such opinion testimony rest on "sufficient facts or data" and reflect the use of "reliable principles and methods" appropriate to the expert's field. Id.

These requirements impose a correlative obligation upon a trial court to serve as a gatekeeper in order to ensure, as a condition of admissibility, that proffered expert testimony rests

on a sufficiently trustworthy foundation.  <u>Daubert</u> v. <u>Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993).  Where, as here, the factual basis of an expert's testimony is called into question, the district court must determine whether the testimony has "a reliable basis" in light of the knowledge and experience of the relevant discipline.  <u>Kumho Tire Co.</u> v. <u>Carmichael</u>, 526 U.S. 137, 148 (1999) (quoting <u>Daubert</u>, 509 U.S. at 592).

In this instance, we conclude that the decision to allow Dr. Leslie to testify was comfortably within the realm of the district court's discretion.  Dr. Leslie's credentials as an expert hardly can be questioned: he is a Board-certified orthopedic surgeon specializing in hand and wrist deformities.  By the same token, the need for expert testimony cannot be gainsaid: expert testimony is necessary in virtually all medical malpractice cases to shed light on the applicable standard of care.  <u>See</u>, <u>e.g.</u>, <u>Dunning</u> v. <u>Kerzner</u>, 910 F.2d 1009, 1014 (1st Cir. 1990) (requiring expert testimony under Rhode Island law); <u>Wilkinson</u> v. <u>Vesey</u>, 110 R.I. 606, 613, 295 A.2d 676, 682 (1972) (same).  The real question, then, is whether Dr. Leslie, in forming his opinions, relied on "sufficient facts or data."  Fed. R. Evid. 702.

In preparation for his court appearance, Dr. Leslie reviewed the October 20, 2002 emergency room record, a radiologist's interpretive report regarding the first set of x-rays, the defendant's interpretive reports anent sundry x-rays as

well as the MRI, and all of the defendant's office notes (including those written by the physician's assistant).  In addition, he reviewed the relevant physical therapy records and the records pertaining to Dr. Akelman's surgical intervention.  We believe that the district court acted within the scope of its discretion in finding that this extensive investigation fulfilled the "sufficient facts or data" requirement.

The plaintiff nevertheless argues that Dr. Leslie's testimony was built on too porous a foundation to satisfy the imperatives of Rule 702 because the witness consulted x-ray and MRI reports prepared by others instead of reading the films himself. We disagree: Dr. Leslie's reliance on the reports was plainly justified in light of the custom and practice of the medical profession. Doctors routinely rely on observations reported by other doctors, see, e.g., Manocchio v. Moran, 919 F.2d 770, 780 (1st Cir. 1990) (stating that "physicians commonly base their opinions on tests and examinations performed by other physicians"), and it is unrealistic to expect a physician, as a condition precedent to offering opinion testimony in a personal injury case, to have performed every test, procedure, and examination himself. In apparent recognition of this state of affairs, other courts have held that an expert's reliance on x-ray reports rather than the underlying films does not require the exclusion of his testimony. See, e.g., Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., 388

F.3d 976, 982 (6th Cir. 2004); <u>Blakeman</u> v. <u>Condorodis</u>, 599 N.E. 2d 776, 778 (Ohio Ct. App. 1991); <u>see</u> <u>also</u> <u>Manocchio</u>, 919 F.2d at 780 (mentioning "the reading of an x-ray by a radiologist" as an example of when a testifying physician appropriately may rely on the report of another physician).

Here, moreover, Dr. Leslie testified that orthopedists customarily form opinions based on medical reports rather than seeking to verify independently the underlying primary evidence. Given this testimony, the district court was fully entitled to conclude that the use of x-ray and MRI reports by the witness had a reliable basis in the experience of the medical profession. <u>Daubert</u>, 509 U.S. at 592.

If more were needed — and we doubt that it is — the plaintiff's objection clashes with Federal Rule of Evidence 703. That rule specifically authorizes experts to rely on materials compiled by others as long as those materials are "of a type reasonably relied upon by experts in the particular field." Rule 703 was enacted in part "to bring the judicial practice into line with the practice of the experts themselves when not in court." Fed. R. Evid. 703 advisory committee's notes. Indeed, the drafters of the rule explicitly contemplated that experts in the medical field would routinely rely on reports from other medical professionals. <u>See</u> <u>id.</u>

-9-

To sum up, the plaintiff's rigid reading of Rule 702 runs counter both to the Evidence Rules and to the broad latitude given district courts with respect to the determination of the admissibility of expert testimony. The reliability inquiry is case-specific, see Kumho Tire, 526 U.S. at 141, and in the circumstances at hand, Dr. Leslie's reliance on the x-ray and MRI reports did not render his testimony either unreliable or inadmissible.[1] Cf. Microfinancial, Inc. v. Premier Holidays Int'l., Inc., 385 F.3d 72, 80 (1st Cir. 2004) ("Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony.").

This result is well within the mainstream of acceptable trial practice. Objections of this type, which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility. See id. at 81; Int'l Adhesive Coatings Co. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 545 (1st Cir. 1988). As such, these matters are for the jury, not for the court. This is as it should be; the

---

[1]In any event, the plaintiff has not alleged that the x-ray and MRI reports were in any way inaccurate. The absence of any material differences between the reports and the underlying studies would seem to render any error harmless. See Coleman v. De Minico, 730 F.2d 42, 46 (1st Cir. 1984).

district court's gatekeeping function ought not to be confused with the jury's responsibility to separate wheat from chaff.[2]

We need not linger long over the plaintiff's claim that the district court erred in denying her motion for a new trial. In the ordinary course, a district court may order a new trial under Federal Rule of Civil Procedure 59(a) "only if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice." Casillas-Díaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006). A district court's refusal to order a new trial under Rule 59(a) is reviewed for abuse of discretion. Sanchez v. P.R. Oil Co., 37 F.3d 712, 717 (1st Cir. 1994).

In support of her new trial motion, the plaintiff sings a familiar tune. She suggests that the district court's putative error in admitting Dr. Leslie's testimony worked a miscarriage of justice. This is the same mantra that we already have heard and rejected, and there is no point in embarking on a twice-told tale. It suffices to say that our earlier finding — that the district

_____

[2]An expert's ability to rely on secondary evidence does not threaten the integrity of the adversary system. That system provides numerous safeguards against abuse. These include the ready availability of opportunities for voir dire, the trial court's exercise of informed discretion, the prospect of vigorous cross-examination, the right to present contrary evidence, and the court's instructions to the jury (which typically will cover not only the jury's right to accept or reject expert testimony but also the allocation of the burden of proof).

court acted within its discretion in allowing Dr. Leslie to testify — requires us to reject this suggestion as well.

In an abundance of caution, we nevertheless have mined the entire record. The evidence was conflicted, and in large measure the case came down to which expert — Dr. Leslie or Dr. Rozmaryn — the jury, properly instructed, found more convincing. In the absence of any legal error — and the plaintiff has identified none — we cannot fault the able district judge for leaving the jury's credibility call in place. We hold, therefore, that the district court did not abuse its discretion in refusing to give the plaintiff a second bite at the cherry.

We need go no further. For the reasons elucidated above, we uphold the judgment of the district court.


**<u>Affirmed.</u>**