08-4483-cv(L)
Louis Vuitton Malletier S.A. v. LY USA, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued:  May 27, 2011          Decided:  March 29, 2012)

 Docket Nos. 08-4483-cv, 08-4525-cv, 08-4528-cv, 08-5108-cv, 08-5273-cv, 08-5290-cv

-------------------------------------

LOUIS VUITTON MALLETIER S.A.,

Plaintiff-Appellee,

- v -

LY USA, INC., COCO USA INC., CHONG LAM, MARCO LEATHER GOODS, LTD., JOYCE CHAN,

Defendants-Cross Claimants-Cross Defendants-Appellants.

-------------------------------------

Before:   SACK, LIVINGSTON, and LYNCH, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Alvin K. Hellerstein, Judge, granting summary judgment to the plaintiff on its claims of trademark counterfeiting and infringement, and awarding the plaintiff statutory damages in the amount of $3 million, and more than $500,000 in attorney's fees and costs. The defendants base their appeal of the judgment on the counterfeiting and infringement claims primarily on the district court's denial of a stay of the action pending the resolution of a related criminal proceeding.  They also appeal from the award of attorney's fees to the plaintiff under 15 U.S.C. § 1117.  We

conclude that the district court did not abuse its discretion in declining to stay the proceedings; that, as the district court concluded, an award of attorney's fees under 15 U.S.C. § 1117(a) may accompany an award of statutory damages pursuant to 15 U.S.C. § 1117(c); and that the district court did not abuse its discretion in awarding such fees or in setting their amount.

The judgment of the district court is affirmed.

ANGELO RIOS (Mark N. Antar, on the brief), Cheven, Keely & Hatzis, New York, NY, for Defendants-Cross Claimants-Cross Defendants-Appellants CoCo USA Inc. and Joyce Chan.

JOHN K. ZWERLING (Michael G. Dowd, Law Offices of Michael G. Dowd, New York, NY; Kathleen C. Waterman, Thomas Torto, Law Offices of Kathleen C. Waterman, New York, NY, on the brief) Zwerling, Leibig & Moseley, P.C., Alexandria, VA, for Defendants-Cross Claimants-Cross Appellants Chong Lam, LY USA Inc., and Marco Leather Goods, Ltd.

MICHAEL J. ALLAN (William G. Pecau, on the brief), Steptoe & Johnson LLP, Washington, DC, for Plaintiff-Appellee Louis Vuitton Malletier.

SACK, Circuit Judge:

The defendants -- LY USA, Inc., CoCo USA Inc., Marco Leather Goods, Ltd., Chong Lam, and Joyce Chan -- appeal from judgments entered September 2, 2008, and October 15, 2008, in the United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge) granting summary judgment to the plaintiff Louis Vuitton Malletier S.A. ("Louis Vuitton" or "Vuitton") on its claims of trademark counterfeiting and

2

infringement, and awarding Vuitton statutory damages in the amount of $3 million, and more than $500,000 in attorney's fees[1] and costs.

The defendants appeal from five separate decisions of the district court: (1) the grant of summary judgment on the trademark counterfeiting and infringement claims; (2) the award of statutory damages; (3) the denial of the defendants' motion to adjourn oral argument to permit the defendants to examine purportedly new evidence; (4) the denial of the defendants' motion to stay the proceeding pending the outcome of a related criminal proceeding; and (5) the grant of attorney's fees in addition to statutory damages. We affirm the judgment of the district court on the first three of these issues by a summary order filed today. This opinion addresses only the denial of the motion for a stay and the award of attorney's fees.

The defendants argue that the district court erred in denying the requested stay because the court did not give sufficient weight to the consequent impairment of the indicted defendants' Fifth Amendment privilege against self-incrimination, and because it failed to consider the practical difficulties

_____

[1] We refer to such fees throughout this opinion as "attorney's fees," the term used in 15 U.S.C. § 1117(b), rather than the less commonly used "attorney fees," the term used in 15 U.S.C. § 1117(a), or the likely more accurate "attorneys' fees," see NAACP v. Town of E. Haven, 259 F.3d 113, 115 n.1 (2d Cir. 2001) ("Although the fees sought in this case are for multiple attorneys, we refer to them in the singular possessive, 'attorney's fees,' because that is the term used by [the statute in that case] for such awards.").

3

attendant on defending simultaneous criminal and civil proceedings. The defendants also contend that the district court lacked a statutory basis for awarding attorney's fees because Louis Vuitton had elected to recover statutory damages, rather than actual damages, under the Lanham Act, and that in any event the attorney's fees were excessive.

We disagree with the contentions of the defendants. We conclude that the district court did not abuse its discretion in denying the stay. We also conclude that a plaintiff electing statutory damages pursuant to 15 U.S.C. § 1117(c) may recover attorney's fees pursuant to 15 U.S.C. § 1117(a), and that the district court did not abuse its discretion either in awarding attorney's fees and costs in this case or in determining their amount.

**BACKGROUND**

This case is about an alleged large-scale trademark counterfeiting operation conducted by the defendants Lam and Chan and several companies that they either controlled or were otherwise associated with. It involved the importation and sale of counterfeit luxury goods bearing trademarks owned by Louis Vuitton and others. After the conclusion of this civil case, the defendants were convicted in the United States District Court for the Eastern District of Virginia for their importation into the United States and sale of more than 300,000 handbags, wallets, and other products that resembled goods produced by Louis

4

Vuitton, Burberry, Coach, and other luxury goods manufacturers.[2] Lam and Chan used a variety of companies, including defendants-appellants LY USA. Inc., CoCo USA Inc., and Marco Leather Goods, Ltd., to facilitate their operation. "Whenever [Customs and Border Patrol ("CBP")] agents would identify one corporation as an importer of counterfeit goods, Defendants would continue to import goods into the same port, but under a different corporate name. If Defendants believed CBP agents could identify them as responsible for importing counterfeit goods into a port, they would ship the goods to a different port." United States v. Lam, No. 3:07-CR-374, 2010 WL 5178839, at *1, 2010 U.S. Dist. LEXIS 132126, at *3 (E.D. Va. Dec. 14, 2010). Goods allegedly imported by the defendants were seized between August 2002 and January 2008 in Houston, Los Angeles, Newark, New York, Norfolk, and elsewhere.

This civil case comprises claims by Louis Vuitton against the defendants for the related counterfeiting and infringement of their trademarks. The district court determined that three of the defendants' collections infringed or were counterfeit copies of five separate Louis Vuitton trademarks. The court based its conclusion on testimony, adverse inferences drawn from the failure of the corporate defendants to offer

---

[2] The details of the related criminal proceeding are rehearsed here for background purposes only. This Court may take judicial notice of any fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

testimony, records of numerous customs seizures, and visual evidence. Tr. of Oral Arg. on Summ. J. Mot. at 53, Louis Vuitton Malletier S.A. v. LY USA Inc., et al., No. 06-cv-13463 (S.D.N.Y. August 7, 2008)("Summ. J. Hr'g Tr.").

The Parties

Louis Vuitton is a French fashion house founded in 1854. It began selling its products in the United States in 1893. Since 1987, it has been a part of LVMH Moët Hennessy, a publicly traded corporation. Louis Vuitton manufactures and distributes luxury consumer goods, including leather goods, designer luggage, purses, handbags, leather travel accessories, jewelry, shoes, and other high-end fashion apparel. Vuitton has registered with the U.S. Patent and Trademark Office many trademarks, including its well-known monogram logo, which consists of a stylized, overlapping "L" and "V" (the "LV Logo Mark"). The company spends millions of dollars each year to advertise and market its trademarked goods in magazines, newspapers, catalogs, targeted mailings, and on the Internet. See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 112 (2d Cir. 2006) (describing Louis Vuitton's business model, trademarks, and marketing expenditures); Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 534-35 (2d Cir. 2005) (same); see also Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 257-58 (4th Cir. 2007) (same); Steven Greenhouse, The Champagne of Mergers, NEW YORK TIMES D1 (June 4, 1987) (describing the merger of Moët-Hennessy and Louis Vuitton).

6

The defendants are LY USA, Inc., ("LY Inc.") a New York corporation formed in 2003, which primarily produces and markets "LY"-branded handbags and wallets; Marco Leather Goods, Ltd., ("Marco Ltd.") a New York corporation formed in 1999, which imports "Marco"-branded handbags and wallets and sells them to wholesale customers throughout the United States; and CoCo USA Inc., ("CoCo Inc.") a New York corporation formed in 2003, which is a wholesaler and distributor of handbags and leather goods. LY Inc., Marco Ltd., and CoCo Inc. all operate out of the same business address at 135 West 30th Street in Manhattan. The defendant Lam is the president and owner of Marco Ltd.; the defendant Chan is a manager and director of that company. Lam and Chan are not married, but have two children together. CoCo principally distributes goods imported by Marco, and sells them through venues including a storefront location at 135 West 30th Street. CoCo is owned by a member of Lam's family, and both Lam and Chan are associated with the company. Lam is also a shareholder, officer, and director of LY Inc. The goods imported and sold by the defendants were manufactured at a factory in China owned by Lam's family.

### Louis Vuitton's Trademarks

Louis Vuitton owns many trademarks, some of which are widely recognized. Five are at issue in this litigation: the LV Logo Mark, three different geometric floral motifs (the "Flower Design Marks"), and a composite pattern consisting of repetitions of the LV Logo Mark centered inside the three Flower Design Marks. Louis Vuitton has registered each of these marks with the U.S. Patent and Trademark Office on the principal register, and each has become "incontestable" as a result of its continuous use in commerce for more than five years. See 15 U.S.C. § 1065 (governing incontestability); Dooney & Bourke, 454 F.3d at 112 (noting that these marks are incontestable).

### The Civil Lawsuit

On November 22, 2006, Louis Vuitton filed this lawsuit in the United States District Court for the Southern District of New York alleging that the defendants sold counterfeit handbags and travel apparel bearing infringing versions of Louis Vuitton's marks to retail kiosks and specialty stores, and on the Internet to both wholesale and retail customers. In its complaint, Vuitton asserted claims for trademark counterfeiting, trademark and service mark infringement, trademark dilution, and false designation of origin forbidden by Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), 1125(c);[3] trademark

---

[3] 15 U.S.C. § 1114(1)(a) makes civilly liable any person who uses a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" without the consent of the registrant if "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1125(a) authorizes a civil action

infringement and unfair competition in violation of New York State common law; and violations of New York General Business Law §§ 349, 360-l.[4]

Louis Vuitton alleged that the defendants had supplied tens of thousands of items bearing counterfeits and infringements of the Louis Vuitton trademarks to wholesalers and retail kiosks throughout the United States. Vuitton alleged that U.S. Customs officials had seized tens of thousands of counterfeit handbags, tote bags, cosmetic bags, and wallets imported by LY Inc. and Marco Ltd. because those products infringed Louis Vuitton's marks. Each of the defendants answered the plaintiff's complaint and interposed cross-claims against one another for indemnification and contribution.

After fruitless settlement discussions, discovery was begun. Louis Vuitton's efforts were aimed at ascertaining the scope of the defendants' counterfeiting and infringement in order to determine the appropriate amount of damages to seek. The

---

against any person who uses "any word, term, name, symbol, or device" in a manner likely to deceive as to the origin of the product or the affiliation of the supplier. And 15 U.S.C. § 1125(c) permits the owner of a "famous mark" to seek injunctive relief against another person whose of use of a mark "is likely to cause dilution by blurring or dilution by tarnishment of the famous mark."

[4] Section 349 generally provides that deceptive acts or practices in the conduct of business are unlawful. N.Y. Gen. Bus. Law § 349 (McKinney 2011). Section 360-l provides for injunctive relief where injury to business reputation or dilution of a registered mark is likely. Id. § 360-l.

first document production by the defendants in August 2007 resulted in the production of fewer than 40 pages. On September 25, 2007, Vuitton sent letters to all of the defendants outlining what it said were deficiencies with their production and also with contemporaneous interrogatory answers. Vuitton also asked the district court to order the defendants to produce additional documents and to complete and verify interrogatory answers no later than the time of a status conference scheduled for January 3, 2008.

On October 23, 2007, the parties sent a joint letter to the district court noting that Louis Vuitton had noticed six depositions, and had notified the defendants "of deficiencies with their written discovery." Letter from Michael J. Allan, Esq. et al., to Hon. Alvin K. Hellerstein at 1, Louis Vuitton Malletier S.A. v. LY USA Inc., et al., No. 06-cv-13463 (S.D.N.Y. Oct. 23, 2007), ECF No. 25. The parties requested a stay of discovery pending a mediation before a magistrate judge. The letter read, in part:

> [T]he defendants have agreed to provide Louis Vuitton with certain information sufficiently in advance of mediation to help facilitate an efficient and useful mediation. Specifically, defendants will provide Louis Vuitton with complete sales, inventory and supplier information for all merchandise Louis Vuitton contends is counterfeit and/or infringing of its trademarks as well as any other merchandise defendants may have manufactured, imported or sold that bear marks similar to or substantially indistinguishable from Louis Vuitton's trademarks.

Id. at 1.

On December 7, 2007, Louis Vuitton's counsel reported to the court that the mediation had not been successful, and that the defendants had not produced "complete 'sales, inventory and supplier' information" in advance of the mediation as promised. Letter from Michael J. Allan, Esq. to Hon. Alvin K. Hellerstein at 1, Louis Vuitton Malletier S.A. v. LY USA Inc., et al., No. 06-cv-13463 (S.D.N.Y. Dec. 7, 2007), ECF No. 28 ("December 7 Discovery Letter"). Counsel requested an order compelling discovery or a conference to address the outstanding discovery issues. Id. at 2.

A status conference was then held on January 3 or 4, 2008, to address these disputes. No transcript or other record of this proceeding was created.

On February 13, 2008, Lam and Chan jointly wrote to the District Court notifying it that they had been arrested elsewhere. They requested a stay of this lawsuit pending resolution of the federal criminal proceedings because, counsel said, in executing the search warrant at their business headquarters on January 16 in connection with the criminal proceedings, federal law enforcement officials had "remove[d] computers, documents and other records as a well as a significant amount of defendants' merchandise from the premises." Letter from Angelo Rios, Esq., et al. to Hon. Alvin K. Hellerstein at 2, Louis Vuitton Malletier S.A. v. LY USA Inc., et al., No. 06-cv-13463 (S.D.N.Y. Feb. 13, 2008), ECF No. 30 ("February 13 Letter Requesting Stay"). Counsel asserted that as a result, they "no

11

longer ha[d] access to the information, documents and other things necessary to conduct meaningful discovery." Id. Counsel also advised the court that "access to our clients will be severely limited both by the constraints placed upon them by their criminal defense attorneys as well as conditions imposed by the Court with respect to their release from custody." Id. For those reasons, the defendants argued, "it will be impossible . . . to proceed with pretrial discovery in the instant action while the criminal action is pending," and they therefore "request[ed] that all proceedings . . . be stayed until conclusion of the criminal action." Id.

Louis Vuitton responded with a letter opposing the stay, arguing that the defendants "are using the criminal case inappropriately as a shield against the civil case." Letter from Michael J. Allan, Esq. to Hon. Alvin K. Hellerstein at 1, Louis Vuitton Malletier S.A. v. LY USA Inc., et al., No. 06-cv-13463 (S.D.N.Y. Feb. 22, 2008) ("February 22 Letter Opposing Stay Request"). Vuitton explained that at the early January conference, the defendants had represented that they had "no additional responsive documentation" and they had fully answered the interrogatories. Id. at 3.

On March 3, 2008, in a one-page order, the district court denied the defendants' motion for a stay. The court considered the defendants' argument that the parallel criminal proceeding -- as well as the seizure of the defendants' documents, goods, and computers by law enforcement officials --

12

would "impede[] their ability to mount a defense to the civil action, or to engage in meaningful pre-trial discovery."  Order Den. Mot. for Stay at 1, Louis Vuitton Malletier S.A. v. LY USA Inc., et al., No. 06-cv-13463 (S.D.N.Y. March 8, 2008), ECF No. 31 ("Order Denying Motion for Stay").  The court noted Vuitton's opposition to the stay on the grounds that the civil case had been pending for more than a year; that any delay would hinder the plaintiff's "need for prompt redress"; and that "[c]onsiderable discovery already has been had."  Id.  The district court then ruled:

> Defendants' motion is denied.  Plaintiff has an interest in the prompt prosecution of its case.  Its trademark is valuable, and counterfeit goods threaten the value of its trademark and cut into sales.  If there is imposition involved, the court can deal with such matters as and when there is threat of imposition.

Id. at 1.

On March 25, 2008, defendants Lam and Marco Ltd. filed a motion for reconsideration of their request for a stay.  They then argued for the first time that they and the other defendants intended to assert their Fifth Amendment rights in the course of their depositions.

> [P]laintiff insists on going forward with defendants' depositions in an attempt . . . to take advantage of defendants' situation so that plaintiff can then move for summary judgment relying on the absence of testimony from defendants as well as the adverse inference which might be raised by defendants' asserting their constitution[al] right not to incriminate themselves.

13

Not. Of Cross-Motion to Rearg. ¶ 7, <u>Louis Vuitton Malletier S.A. v. LY USA Inc., et al.</u>, No. 06-cv-13463 (S.D.N.Y. March 26, 2008), ECF No. 54.

The district court, noting that it had "previously considered the arguments presented in this motion, evaluated the balance of convenience and prejudices, and came to [its] rulings," denied the motion. Den. of Mot. for Recons., <u>Louis Vuitton Malletier S.A. v. LY USA Inc., et al</u>, No. 06-cv-13463 (S.D.N.Y. March 26, 2008), ECF No. 54.

Discovery continued. Louis Vuitton gave notices of deposition of the defendants Lam and Chan. They refused to appear, citing their intent to exercise their Fifth Amendment right against self-incrimination. Vuitton then moved to compel their depositions. The district court granted the motion, and Chan and Lam appeared for depositions on April 15 and April 16, respectively. But both asserted their Fifth Amendment privileges and refused to answer nearly every question asked of them.

On June 5, 2008, Louis Vuitton moved for summary judgment on all of its federal and state-law claims. The same day, Vuitton also moved pursuant to Rule 37(d) to preclude the three corporate defendants[5] -- LY Inc., Marco Ltd., and CoCo Inc.

---

[5] Corporations do not have a Fifth Amendment right against self-incrimination. <u>See, e.g.</u>, <u>Braswell v. United States</u>, 487 U.S. 99, 105 (1988) (noting that prior cases had "settled that a corporation has no Fifth Amendment privilege"); <u>In re Grand Jury Subpoena Issued June 18, 2009</u>, 593 F.3d 155, 157-58 (2d Cir. 2010) (per curiam) ("[C]orporations cannot avail themselves of the Fifth Amendment privilege."). In this Circuit, at least, this rule includes small or solely owned corporations. <u>See</u> <u>In re Grand Jury Subpoena</u>, 593 F.3d at 158-59. Accordingly, a

-- from submitting further evidence as a sanction for their failure to respond to the plaintiff's demand for Rule 30(b)(6) depositions.[6]

In responding to that motion, one of the defendants' attorneys declared that "Marco and Lam have . . . responded to plaintiff's requests for admissions, interrogatories, and other discovery requests. Notably, plaintiff does not point to any specific written discovery requests to which defendants Marco and Lam did not fully respond." Decl. of Thomas Torto in Opp'n to Mot. to Preclude Introduction of New Evidence ¶ 3, Louis Vuitton

---

corporation may not refuse to submit to a Rule 30(b)(6) deposition, or to turn over corporate records, on the grounds that such acts may tend to incriminate it. Id. at 157-58. The defendant corporations were, of course, free to designate individuals other than Chan and Lam as 30(b)(6) witnesses. See Fed. R. Civ. P. 30(b)(6).

[6] Rule 30(b)(6) provides:

*Notice or Subpoena Directed to an Organization.* In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

*Malletier S.A. v. LY USA Inc., et al,* No. 06-cv-13463 (S.D.N.Y. June 20, 2008), ECF No. 74.

The parties briefed both the summary judgment motion and the motion to preclude. At oral argument on August 7, 2008, after hearing from all of the parties, the district court granted summary judgment to Louis Vuitton on the trademark counterfeiting and infringement claims, and granted Louis Vuitton a permanent injunction. The court did not appear explicitly to draw any adverse inference from Lam's and Chan's invocation of the Fifth Amendment. However, it did draw an adverse inference from the corporate defendants' refusal to submit Rule 30(b)(6) witnesses for depositions. See Summ. J. Hr'g Tr. at 46, 53. The district court granted summary judgment on the counterfeiting claims based on the testimony of a person who had been involved in the operation, and "the absence of any opposition testimony by the defendants, and their indifference . . . to the notices of deposition served on them, the goods found among the counterfeit goods seized by [U.S. Government Immigration and Customs Enforcement, or "ICE"], the catalog photographs of the defendants' goods and so much else." Summ. J. Hr'g Tr. at 53. The court also granted summary judgment on the infringement claims, based on three separate product lines designed by the defendants to resemble various handbags produced by Louis

Vuitton,[7] after an analysis of the factors laid out in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961).

The district court noted that "when the manufacturer of knockoff goods offers a consumer a cheap knockoff copy of the original manufacturer's more expensive product, allowing the buyer to acquire the prestige of owning what appears to be the more expensive product, there is infringement."  Summ. J. Hr'g Tr. at 55.  The court reserved decision on the precise amount of damages that would be awarded:

> I'll give the defendants an opportunity to come forward with proof of their sales and their customers for the accused merchandise. If they refuse, I will take the proper inference and consider the application of the plaintiffs.  If they cooperate, and plaintiffs are able to get an idea of where their merchandise is, and thereby able to mitigate their damage, and how much money the defendants made, I will take that into consideration in fixing the appropriate sum.

<u>Id.</u> at 58.

One of the defendants' attorneys again protested that he would not be able to produce the sales records because they had been seized in connection with the criminal case.  The

---

[7] Those product lines are known as the M9 collection, the LY collection, and the Cherry Blossom collection.  The district court explained that the "M9 collection . . . bears substantial similarity to the [LV Logo Mark, floral motifs, and composite mark] except that a cursive M replaces the LV logo, and that the flower design is somewhat modified."  Summ. J. Hr'g Tr. at 7.  The Cherry Blossom collection "features bags with a brown canvas base similar to the canvas of the Louis Vuitton bags, and the LY logo is in contrasting colors in pink and red cherry blossom flowers superimposed with pink and red cherry blossoms and flowers superimposed over the logos."  <u>Id.</u> at 7-8.  The LY Collection "replicates all of the Louis Vuitton marks except that they've replaced an overlapping LV with a LY."  <u>Id.</u> at 15.

district court instructed Louis Vuitton's attorney to assist the defendants in responding by contacting the United States Attorney to try to secure the seized records, and noted that "if any orders or interventions from me would be helpful, I'll be glad to." Id. at 60.

The district court entered a summary order formalizing its ruling on August 11, 2008, and entered a permanent injunction barring the defendants from infringing Louis Vuitton's trademarks on September 2, 2008.

The district court proceeded to determine the amount of damages and attorney's fees. Louis Vuitton confirmed in a letter to the district court that it was seeking the maximum statutory damages award of eight million dollars, plus attorney's fees, costs, and investigative fees. The parties briefed these issues.

Vuitton detailed its efforts to settle the case and avoid litigation, as well as its efforts to secure records detailing the scope of the defendants' copyright infringement. Louis Vuitton argued for "maximum damages" because the defendants had "hid from discovery the documents and other information that would reveal the full nature and extent of their counterfeiting enterprise and activities."[8] Mem. in Supp. of Appl. for

---

[8] It is unclear to us whether the plaintiff was able to secure any additional records by consulting with the U.S. Attorney's office prosecuting the defendants' criminal case, or whether the defendants were able to do so themselves. The record does not reflect any additional attempts by the defendants to secure the records the unavailability of which they initially argued supported their application for the stay, nor did they make any specific objections to the civil proceedings on the basis of their inability to introduce specific documents.

Statutory Damages, Attorney's Fees, Investigative Fees and Costs at 8, <u>Louis Vuitton Malletier S.A. v. LY USA Inc., et al.</u>, No. 06-cv-13463 (S.D.N.Y. Sept. 8, 2008), ECF No. 114.

The defendants argued that Louis Vuitton was precluded by statute from recovering attorney's fees, that the attorney's fees requested were excessive, and that the $8 million in statutory damages Louis Vuitton sought "is not fair compensation but punitive and draconian, grossly in excess of any actual harm." Mem. in Opp. to Appl. for Statutory Damages, Attorney's Fees, Investigative Fees and Costs at 14, <u>Louis Vuitton Malletier S.A. v. LY USA Inc., et al.</u>, No. 06-cv-13463 (S.D.N.Y. Sept. 19, 2008), ECF No. 128.

On October 3, 2008, the district court awarded Louis Vuitton $3 million in statutory damages and $556,934.22 in attorney's fees and costs. The court noted that the "[d]efendants, despite their protestations to the contrary, have produced limited records, accountings, and sales invoices regarding the merchandise at issue. Their failure to do so invites an inference of a massive counterfeiting enterprise." Order Awarding Statutory Damages, Attorney's Fees, and Expenses at 3, <u>Louis Vuitton Malletier S.A. v. LY USA Inc., et al.</u>, No. 06-cv-13463 (S.D.N.Y. Oct. 3, 2008), ECF No. 133 ("Order Awarding Statutory Damages"). The court concluded that an award of half the $1,000,000 maximum statutory damages -- $500,000 -- was appropriate for each of the LV Logo Mark and the three floral motifs (4 x $500,000 = $2,000,0000); plus $250,000 for the

19

composite mark, and $250,000 each for the three infringements of other types of goods (4 x $250,000 = $1,000,0000), for a total of $3 million. Id. at 4-5.

Each of the defendants filed timely appeals from these judgments, which appeals were, however, withdrawn almost immediately by stipulation of the parties. It was agreed among them that the appeals would be subject to reactivation within 30 days after the jury returned a verdict in the criminal prosecutions of Lam and Chan, or by August 2009, whichever came first. Subsequent stipulations extended the alternate deadline date to July 15, 2010.

The Criminal Proceedings

On October 2, 2007, a sealed indictment of Lam and Chan, and Eric Yuen, one of their employees, was filed in the Eastern District of Virginia. See Sealed Indictment, United States v. Lam, No. 07-cr-374 (E.D. Va.), ECF No. 3. A superseding indictment, filed March 26, 2009, charged the three defendants with one count of conspiracy to traffic in counterfeit goods, in violation of 18 U.S.C. § 371; two counts of smuggling goods into the United States, in violation of 18 U.S.C. § 545; and four counts of trafficking in counterfeit goods, in violation of 18 U.S.C. § 2320(a). The charges arose out of Lam and Chan's alleged conspiracy to import and smuggle counterfeit merchandise into the United States between August 2002 and January 2008. See Superseding Indictment, United States v. Lam, No. 07-cr-374 (E.D. Va. March 26, 2009), ECF No. 60. The defendants allegedly

20

counterfeited luxury goods produced and distributed by Louis Vuitton and by others under various other trademarks. The indictment alleged that Lam, Chan, and Yuen acted in concert with seven unindicted corporate coconspirators, including LY Inc., CoCo Inc., and Marco Ltd., to import counterfeit and infringing goods. The defendants allegedly imported these goods through different American ports, including, as noted above, Houston, Newark, New York, Los Angeles, and Norfolk, and used different corporate identities in an attempt to thwart seizures of their goods by customs officials. Despite their attempts to evade Customs, officials seized more than 300,000 items imported by the Lam and Chan. United States v. Lam, 2010 WL 5178839, at *1, 2010 U.S. Dist. LEXIS 132126, at *3.

On January 16, 2008, Immigration and Customs Enforcement agents arrested defendants Lam and Chan at their home in Queens, New York. In addition, search warrants were executed at the defendants' business headquarters in midtown Manhattan. Lam and Chan were arraigned in federal court in Richmond, Virginia, on February 12, 2008.

On January 10, 2010, the defendants' criminal trial began. When the jury deadlocked, a mistrial was declared on January 25, 2010.[9]

---

[9] The jury was apparently unable to decide whether counterfeit bags were actually seized in Norfolk, Virginia. Counts Two through Seven of the Superseding Indictment related only to seizures in Norfolk.

After a subsequent retrial, on June 10, 2010, defendants Lam and Chan were convicted of one count of conspiracy to traffic in counterfeit goods, 18 U.S.C. § 371, two counts of trafficking in counterfeit goods, 18 U.S.C. § 2320(a), and two counts of smuggling goods into the United States, 18 U.S.C. § 545. Lam and Chan were convicted principally of charges related to a mark registered by Burberry Limited, not Louis Vuitton.[10] The jury acquitted Yuen of all charges. See United States v. Lam, 2010 WL 5178839, at *1, 2010 U.S. Dist. LEXIS 132126, at *3-*4.

> On January 7, 2011, [the court] sentenced Lam to eleven months and twenty-five days on [three of the] counts . . . and eighteen months [on two of the counts], all to be served concurrently. The Court sentenced Chan on the same day to five months imprisonment to be followed by five months of home confinement with electronic monitoring on each of [the five counts of her conviction], all to be served concurrently.

United States v. Lam, No. 3:07-CR-374, 2011 WL 1167208, at *2, 2011 U.S. Dist. LEXIS 33351, at *4-*5 (E.D. Va. Mar. 28, 2011).

Lam and Chan subsequently appealed their criminal convictions; the government cross-appealed as to the sentences. Those appeals remain pending. See United States v. Lam, Nos. 11-4056, 11-4081 (4th Cir.).

---

[10] Allegations related to the importation of counterfeit Louis Vuitton merchandise were included in Count One of the Superseding Indictment, conspiracy to traffic in counterfeit goods, of which Lam and Chan were found guilty. No allegations relating to Louis Vuitton merchandise were included in the remaining six counts of the Superseding Indictment.

Meanwhile, on June 30, 2010, all defendants jointly moved to reactivate these appeals. They were reinstated by order of this Court dated July 12, 2010.

**DISCUSSION**

I. Jurisdiction

The district court had subject-matter jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1338(a)-(b), and 1367(a). We have subject-matter jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

II. The Defendants' Motion to Stay Proceedings

The defendants argue that the district court abused its discretion in denying their request to stay the civil action pending the resolution of the criminal prosecutions of Lam and Chan in the Eastern District of Virginia. They assert that the weight of authority in this Circuit favors a stay where, as here, an indictment has issued against a civil defendant in a substantially related criminal matter. Moreover, they argue that "[t]he prejudice to defendants was severe and clearly outweighed any inconvenience to plaintiff caused by the delay in prosecuting this matter. . . . [Therefore,] Lam and Chan's Fifth Amendment privilege should not have been made subordinate to the commercial interests of Vuitton." Br. of Def.'s-Cross-Cl.'s-Cross-Def.'s-Appellants at 18-19, Louis Vuitton Malletier S.A. v. LY USA, Inc., et al., No. 08-4483 (2d Cir. Nov. 9. 2010).

The defendants further contend that when Lam and Chan invoked their Fifth Amendment rights against self incrimination at their depositions, the district court drew adverse inferences

23

against them -- inferences that supported the grant of summary judgment in Louis Vuitton's favor.  The defendants also assert that by denying the stay, the district court deprived the corporate defendants of the opportunity to offer testimony by Lam and Chan in their defense.  The district court's denial of the stay, they argue, thereby "effectively doom[ed]" both the individual and corporate defendants' efforts to defend the action.  Id. at 11.

A. Standard of Review

"A district court's decisions regarding the timetable for trial will not be reversed absent an abuse of discretion.  To demonstrate an abuse of this discretion, a defendant must demonstrate arbitrary action that substantially impaired the defense."  United States v. Beverly, 5 F.3d 633, 641 (2d Cir. 1993) (citation omitted) (concluding that refusal of district court to grant continuance to permit two of criminal defendant's witnesses to appear at trial was within court's discretion); accord Microfinancial, Inc. v. Premier Holidays Int'l, Inc., 385 F.3d 72, 77-79 (1st Cir. 2004) (deciding district court's refusal to stay civil case in light of criminal investigation not abuse of discretion).

B. Governing Law

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  Landis v. N. Am. Co., 299 U.S. 248, 254 (1936); accord Clinton v. Jones, 520 U.S. 681, 706-08

24

(1997); see also United States v. Kordel, 397 U.S. 1, 12 n.27 (1970) (noting that courts may "defer[] civil proceedings pending the completion of parallel criminal prosecutions when the interests of justice seem[] to require such action"); Kashi v. Gratsos, 790 F.2d 1050, 1057 (2d Cir. 1986) ("'[A] court may decide in its discretion to stay civil proceedings when the interests of justice seem to require such action.'" (quoting SEC v. Dresser Indus., 628 F.2d 1368, 1372 (D.C. Cir. 1980) (en banc)) (ellipses and internal quotation marks omitted; emphasis added)); Nosik v. Singe, 40 F.3d 592, 596 (2d Cir. 1994) ("Although civil and criminal proceedings covering the same ground may sometimes justify deferring civil proceedings until the criminal proceedings are completed, a court may instead enter an appropriate protective order.").  "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  Landis, 299 U.S. at 254-55; see also Ofosu v. McElroy, 98 F.3d 694, 699 (2d Cir. 1996) ("A request for a stay is an appeal to equity.").

The person seeking a stay "bears the burden of establishing its need."  Clinton, 520 U.S. at 708.  "[A]bsent a showing of undue prejudice upon defendant or interference with his constitutional rights, there is no reason why plaintiff should be delayed in its efforts to diligently proceed to sustain its claim."  Hicks v. City of N.Y., 268 F. Supp. 2d 238, 241 (E.D.N.Y. 2003) (internal quotation marks omitted).

In evaluating whether the "interests of justice" favor such a stay, courts have generally been concerned about the extent to which continuing the civil proceeding would unduly burden a defendant's exercise of his rights under the Fifth Amendment, which provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V.[11] Creative Consumer Concepts, Inc. v. Kreisler, 563 F.3d 1070, 1080 (10th Cir. 2009); see also United States v. All Assets of Statewide Auto Parts, Inc., 971 F.2d 896, 905 (2d Cir. 1992) (same when considering stay of civil forfeiture proceeding). A stay can protect a civil defendant from facing the difficult choice between being prejudiced in the civil litigation, if the defendant asserts his or her Fifth Amendment privilege, or from being prejudiced in the criminal litigation if he or she waives that privilege in the civil litigation. See United States v. 4003-4005 5th Ave., 55 F.3d 78, 83 (2d Cir. 1995) (discussing the "dilemma" faced by criminal defendants forced to testify in a parallel civil forfeiture proceeding). As Judge Hellerstein, who presided in the district court in this case, has observed in his extrajudicial writing, "[t]he greatest risk posed by parallel [civil and criminal proceedings] . . . is that parallel proceedings may place

---

[11] There are other possible justifications for a stay. For example, a district court may issue one in a civil proceeding in deference to a parallel criminal proceeding in order to "prevent either party from taking advantage of broader civil discovery rights" or to "prevent the exposure of the criminal defense strategy to the prosecution." Kreisler, 563 F.3d at 1080.

significant burdens upon the Fifth Amendment privilege against self-incrimination."  Alvin Hellerstein & Gary Naftalis, Private Civil Actions and Concurrent or Subsequent Regulatory or Criminal Proceedings, SG046 ALI-ABA 903, 905 (2001).

A defendant in a civil proceeding who invokes the Fifth Amendment as a result of an overlapping criminal investigation or proceeding "risk[s] the adverse inference arising from [his or her] assertion of the privilege."  Id. at 951.  The Supreme Court has explained "that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); see also Keating v. Office of Thrift Supervision, 45 F.3d 322, 326 (9th Cir. 1995) (observing that it is "permissible" for the trier of fact to draw such adverse inferences).  "[A] party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence, and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation."  4003-4005 5th Ave., 55 F.3d at 83 (citation and internal quotation marks omitted); see also LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999) (noting that it is permissible to give an adverse inference "significant weight," as "silence when one would be expected to speak is a powerful persuader").

27

But if civil defendants do not elect to assert their Fifth Amendment privilege, and instead fully cooperate with discovery, their "testimony . . . in their defense in the civil action is likely to constitute admissions of criminal conduct in their criminal prosecution."  SEC v. Boock, No. 09 Civ. 8261 (DLC), 2010 WL 2398918, at *2, 2010 U.S. Dist. LEXIS 59498, at *5 (S.D.N.Y. June 15, 2010).  Indeed, "[e]ven where it would not be direct evidence of wrongdoing with respect to the scheme charged in the criminal case, such testimony may be admissible as Fed. R. Evid. 404(b)[12] evidence in any criminal trial."  Id.; see also Milton Pollack, Parallel Civil and Criminal Proceedings, 129 F.R.D. 201, 205-06 (1990) (hereinafter "Pollack, Parallel Proceedings") (explaining how a party's participation in civil proceedings may prejudice his defense in parallel criminal proceedings).

---

[12]  Fed. R. Evid. Rule 404 reads in pertinent part:

Character Evidence; Crimes or Other Acts

\*\*\*

(b) Crimes, Wrongs, or Other Acts.

    (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

    (2) Permitted Uses; Notice in a Criminal Case.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Despite these factors, such "[a] stay of [a] civil case" to permit conclusion of a related criminal prosecution has been characterized as "an extraordinary remedy." Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc., 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995). A district court may stay civil proceedings when related criminal proceedings are imminent or pending, and it will sometimes be prudential to do so. Id. at 1138 n.4 ("Even if a court may constitutionally deny a request for a stay, . . . a stay of a civil action may still be warranted in some instances."). But the Constitution rarely, if ever, requires such a stay. Kashi, 790 F.2d at 1057 ("'[T]he Constitution does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings.'" (quoting Dresser Indus., 628 F.2d at 1372)) (ellipses omitted)); accord United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 388 (2d Cir. 2001); Nosik, 40 F.3d at 596. "A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." Keating, 45 F.3d at 326. The existence of a civil defendant's Fifth Amendment right arising out of a related criminal proceeding thus does not strip the court in the civil action of its broad discretion to manage its docket.

District courts have formulated multi-factor tests to apply in deciding whether, in light of these hazards to the defendants in the civil proceedings against them, to grant a stay of those proceedings. The district courts of this Circuit, for

29

example, have often utilized a six-factor balancing test first set forth by then-district court judge Chin:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

Trs. of Plumbers & Pipefitters Nat'l Pension Fund, 886 F. Supp. at 1139 (footnotes omitted).[13] And several of our sister circuits have adopted similar multi-factor tests. See, e.g.,

---

[13] For cases applying substantially this standard, see also, e.g., Hicks, 268 F. Supp. 2d at 241; Boock, 2010 WL 2398918, at *1-*2, 2010 U.S. Dist. LEXIS 59481, at *4-*5 (quoting Trs. of Plumbers & Pipefitters Nat'l Pension Fund, 886 F. Supp. at 1139); Motorola, Inc. v. Abeckaser, No. 07-CV-3963 (CPS)(SMG), 2009 WL 816343, at *1-*2, 2009 U.S. Dist. LEXIS 24855, at *4 (E.D.N.Y. Mar. 26, 2009); Parker v. Dawson, Nos. 06-CV-6191 (JFB)(WDW), 06-CV-6627 (JFB)(WDW), 07-CV-1268 (JFB)(WDW), 2007 WL 2462677, at *3, 2007 U.S. Dist. LEXIS 63068, at * 10 (E.D.N.Y. Aug. 27, 2007); JHW Greentree Capital, L.P. v. Whittier Trust Co., No. 05 Civ. 2985(HB), 2005 WL 1705244, at *1, 2005 U.S. Dist. LEXIS 14687, at *2 (S.D.N.Y. July 22, 2005). Some district courts have instead applied a similar five-factor test under which the court considers:

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA, 630 F. Supp. 2d 295, 304 (S.D.N.Y. 2009)(listing five-factor test and collecting cases); see also Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc., 87 F.R.D. 53, 56-58 (E.D. Pa. 1980) (Pollak, J.) (originally setting out this test).

Microfinancial, 385 F.3d at 78 (1st Cir. 2004) (applying a five-factor test but also considering "the status of the cases" and "the good faith of the litigants (or the absence of it)"); Keating, 45 F.3d at 324-25 (9th Cir. 1995) (applying a five-factor test).

These tests, however, no matter how carefully refined, can do no more than act as a rough guide for the district court as it exercises its discretion.  They are not mechanical devices for churning out correct results in overlapping civil and federal proceedings, replacing the district court's studied judgment as to whether the civil action should be stayed based on the particular facts before it and the extent to which such a stay would work a hardship, inequity, or injustice to a party, the public or the court.

We think the tests do little more than serve as something of a check list of factors we ought to consider as we review the district court's action for abuse of its discretion. Even if we were to choose or formulate a test and apply it, we would not be able to reverse the district court solely because we disagreed with its application of the test.  The district court's decision ultimately requires and must rest upon "a particularized inquiry into the circumstances of, and the competing interests in, the case."  Banks v. Yokemick, 144 F. Supp. 2d 272, 275 (S.D.N.Y. 2001) (citing Keating, 45 F.3d at 325); see also 4003-4005 5th Ave., 55 F.3d at 85 ("[H]ow a trial court should . . .

react to any motion precipitated by a litigant's assertion of the Fifth Amendment in a civil proceeding . . . necessarily depends on the precise facts and circumstances of each case."); Volmar Dist., Inc. v. New York Post Co., 152 F.R.D. 36, 39 (S.D.N.Y. 1993) ("Balancing these factors is a case-by-case determination, with the basic goal being to avoid prejudice.").[14]  And our role is only to assure that the district court's exercise of discretion was reasonable and in accordance with the law.  A decision so firmly within the discretion of the district court will not be disturbed by us absent demonstrated prejudice so great that, as a matter of law, it vitiates a defendant's constitutional rights or otherwise gravely and unnecessarily prejudices the defendant's ability to defend his or her rights. There may well be cases where the Constitution requires a stay. But a plausible constitutional argument would be presented only if, at a minimum, denying a stay would cause "substantial prejudice" to the defendant.  Keating, 45 F.3d at 325 (internal

---

[14]  Were we forced to choose between the two tests, we would likely prefer Judge Chin's six-part formulation because it explicitly considers the degree to which the issues in the civil and criminal proceedings overlap.  See Trs. of Plumbers & Pipefitters Nat'l Pension Fund, 886 F. Supp. at 1139 ("If there is no overlap, there would be no danger of self-incrimination and accordingly no need for a stay.").  The six-factor test also has the advantage of taking into account the status of the criminal proceeding, including whether the civil defendant has been indicted, a factor that speaks to whether a prosecution is likely and imminent as opposed to a remote or purely hypothetical possibility. But in reviewing district court judgments on appeal, the question for us is whether at the end of the day the trial court abused its discretion, not whether the court employed a superior check list in arriving at its decision.

32

quotation marks omitted). In the more common case, the Fifth Amendment privilege is implicated by the denial of a stay, but not abrogated by it.[15]

Indeed, so heavy is the defendant's burden in overcoming a district court's decision to refrain from entering a stay that the defendants have pointed to only one case in which a district court's decision to deny a stay was reversed on appeal, and that case was decided more than thirty years ago.[16]

C. Application

We conclude that the district court did not abuse its discretion in this case.

---

[15]   Because the denial of a stay here plainly does not violate Lam's and Chan's constitutional rights, we need not speculate further about the circumstances under which a more compelling constitutional argument would be presented. Cases where courts have found a stay constitutionally required are few and far between -- likely because district courts stay proceedings out of an abundance of caution when there is a serious question as to whether a denial would violate the Fifth Amendment. The Eleventh Circuit appears to be the only Circuit that has outlined a specific test for determining whether a stay is constitutionally required. See United States v. Premises Located at Route 13, 946 F.2d 749, 756 (11th Cir. 1991) (stay required when "the invocation of the [Fifth Amendment] privilege must result in an adverse judgment, not merely the loss of [the defendant's] most effective defense. Stated plainly, the rule applies when the invocation of the privilege would result in automatic entry of summary judgment." (citations and internal quotation marks omitted)).

[16]   See Wehling v. CBS, 608 F.2d 1084 (5th Cir. 1979), in which the plaintiff in a libel action had requested a stay in lieu of dismissal pending the outcome of a related criminal proceeding against him. The court faulted the district court for failing to "measure[] the relative weights of the parties' competing interests with a view toward accommodating those interests, if possible." Id. at 1088.

33

There were factors present here that would have supported the entry of a stay. For example, Lam and Chan had been indicted in the parallel criminal proceeding when they sought the stay. The criminal trial was therefore reasonably imminent. See Trs. of Plumbers & Pipefitters Nat'l Pension Fund, 886 F. Supp. at 1140 (observing that a court need not "rely upon fortuitous events to manage its dockets"). There is considerable authority for the principle that a stay is most justified where a movant, like the defendants here, is already under indictment for a serious criminal offense and is required at the same time to defend a civil action involving the same subject matter.[17]

And the individual defendants did face the prospect that any testimony they offered in the civil proceeding would be used against them in the course of the criminal prosecution. The

[17] District courts have not, however, treated the fact that an indictment of the defendants has been handed up at the time of their making a motion for a stay of the civil proceedings as requiring that the stay be entered. In addition to the decision of the district court in this case, see, e.g., Abeckaser, 2009 WL 816343, at *3, 2009 U.S. Dist. LEXIS 24855, at *6 (denying stay in trademark-infringement action where defendants requested a stay on the "eve of summary judgment," eighteen months after a related indictment and when discovery in the civil case had been completed); Fendi Adele S.R.L. v. Ashley Reed Trading, Inc., No. 06 Civ. 0243 (JES)(MHD), 2006 WL 2585612, at *3, 2006 U.S. Dist. LEXIS 64245, at *9 (S.D.N.Y. Sept. 8, 2006) (denying stay in trademark-infringement and counterfeiting action where defendant waited until six months after indictment to request stay); Travelers Cas. & Sur. Co. v. Vanderbilt Grp., LLC, No. 01 Civ. 7927 (DLC), 2002 WL 844345, at *2-3, 2002 U.S. Dist. LEXIS 7939, at *9-11 (S.D.N.Y. May 2, 2002) (declining to stay civil proceedings where "it is clear that many of the issues in this litigation have a life independent from the willingness of the [indicted defendants] to testify or the substance of any testimony they might give").

34

criminal proceeding involved the same subject matter as the civil action: the trafficking in counterfeit handbags and wallets, including those bearing the counterfeit Louis Vuitton marks. The defendants' ability to make use of their Fifth Amendment privileges would therefore have been implicated by a decision to testify in the civil matter. See Trs. of Plumbers & Pipefitters Nat'l Pension Fund, 886 F. Supp. at 1139. And while the corporate defendants could not avail themselves of the privilege, a stay would arguably have served their interests too because of the adverse inferences that the court might have drawn (but apparently did not draw) from the individual defendants' silence, and because those defendants would have been the most appropriate Rule 30(b)(6) witnesses on their behalf.

Also, even in the absence of this civil case, the criminal prosecution would have likely served to protect the interests of consumers and manufacturers -- interests that ordinarily favor prompt resolution of civil counterfeiting and infringement claims. See Brock v. Tolkow, 109 F.R.D. 116, 121 (E.D.N.Y. 1985) ("[W]hile criminal investigations and prosecutions can take a woefully long time, a stay of discovery does not mean that enforcement of the public interests at stake in the civil case will be indefinitely deferred. For one thing, a criminal prosecution serves to enforce those same interests."); Volmar Dist., 152 F.R.D. at 40 (noting, in an antitrust case, that "[t]he public certainly has an interest in the preservation

35

of the integrity of competitive markets," and that "the pending criminal prosecution serves to advance those same interests").

The defendants also urge that their inability to produce documents establishing records of sale, and the implication of their Fifth Amendment privilege, required a stay.[18]  The burden placed on them by the January 16, 2008, seizure of documents and computers from their headquarters by customs officials, they say, favored a stay.  They assert that the district court erred in not considering that burden.

Parts of the defendants' argument, however, ring hollow in light of the defendants' plainly dilatory tactics in tendering discovery even prior to their indictments.  And afterwards, the district court did not leave the defendants without remedy for the potential implications of the parallel criminal proceeding. The court explained that "[i]f there is imposition involved, the court can deal with such matters as and when there is threat of imposition."  Order Denying Motion for Stay at 1.  The court presumably meant that it was open to considering further requests from the defendants for alternative forms of relief, such as tailored stays, protective orders, quashing or modifying subpoenas, sealing confidential material, or even a renewed

---

[18]  These considerations are related.  The "compulsory production of books and papers" does implicate the Fifth Amendment privilege.  See Spevack v. Klein, 385 U.S. 511, 515 (1967).  The defendants here do not argue, however, that they resisted document production because of the possibility of self-incrimination.  Rather, their argument is a purely practical one -- that the unavailability of these documents due to the parallel criminal proceeding was unduly prejudicial.

36

motion for a stay if specific impositions presented themselves. Cf. Pollack, Parallel Proceedings, 129 F.R.D. at 211–12 (describing alternatives to a complete stay of the civil proceedings). The district court also offered assistance in securing the documents that had supposedly been seized by the government in the criminal prosecution.

We see nothing in the record to indicate that the defendants ever pursued such alternative relief. The defendants might have submitted 30(b)(6) witnesses, other than the indicted defendants, who could have offered testimony to fill in the gaps assertedly left by the seizure of these documents. They did not. They might have sought the district court's proffered help in obtaining records or copies of records gathered in the criminal prosecution for production in the civil proceedings. They did not. And we are unaware of any explanation, persuasive or otherwise, that the defendants have given as to the manner in which the unavailability of these documents, computers, or merchandise actually prejudiced them.

We think the defendants' failure to make use of the ability they had, and the additional assistance the district court offered, to make meaningful disclosure is significant. It paints their insistence that the civil proceedings be stayed as part of a larger pattern of overall delay and obfuscation.

The district court noted that the failure of the defendants to produce records invited the inference of a "massive counterfeiting enterprise." Order Awarding Statutory Damages at

37

3. And if the defendants' sales records would have revealed, in full, a counterfeiting operation that netted more than the $8 million in potential statutory damages, they had every incentive to keep those records from the plaintiffs. If those records would have revealed a lesser amount of damages, they had the incentive to pursue those records with every tool at their disposal. The apparent indifference on the part of the defendants to the aid offered them suggests that tendering complete documentation to the plaintiff was not in their interest. To be sure, the challenge of acquiring documentation may have been exacerbated by the criminal proceedings, but the defendants' general failure, with the help of the district court, to work around that set of problems so as to produce substantial information in defense of the civil claims undercuts their claim that the criminal proceedings completely impeded their ability to mount a defense.

Finally, the defendants argue that Lam's and Chan's reliance on their Fifth Amendment privilege favored a stay. Indeed it did, insofar as it limited their ability to assist in defending against the civil claims. But we see nothing in the record to indicate that their invocation of the privilege alone resulted in one or more adverse inferences being drawn against them. The district court explained in its oral summary judgment ruling that if the defendants "come forward with proofs of their sales and their customers for the accused merchandise" the court

would "take that into consideration in fixing the appropriate sum [of damages]." Summ. J. Hr'g Tr. at 58. The court explained that the counterfeiting charges were proved, in part, by "the absence of any opposition testimony by the defendants, and their indifference, I would say, to the notices of deposition served on them." Id. at 53. But during oral argument the court referred only to the failure of the corporate defendants to offer witnesses under Rule 30(b)(6), and suggested that it was that failure alone -- having little to do with the defendants' Fifth Amendment privilege, assuming that other such witnesses were available -- that supported the adverse inferences.[19]

Even if the district court drew adverse inferences from Lam and Chan invoking their Fifth Amendment rights, such inferences were not necessarily material because there was sufficient evidence without them to adequately support the district court's grant of summary judgment. "If defendants choose to remain silent, the adverse inference that may be drawn will be only one of a number of factors the factfinder will consider and will be given no more evidentiary value than the facts of the case warrant." United States v. Dist. Council of

_____

[19] In their initial letter seeking a stay, the defendants did not raise the Fifth Amendment issue. They asserted instead that discovery would have been more difficult for them to comply with because some relevant documents had been seized by the government. It is only now, on appeal, that the parties have extensively briefed the Fifth Amendment issue. The defendants' failure to squarely present their Fifth Amendment argument to the district court in the first instance also calls into question the degree to which they actually feared prejudice in the civil proceeding.

New York City, 782 F. Supp 920, 925-26 (S.D.N.Y. 1992) (internal quotation marks and alteration omitted). The record included visual evidence that enabled the district court to conduct its own comparison of the authentic and accused products, the records of customs seizures, and the defendants' own scant document production. Indeed, that is the evidence on which the district court explained it was largely basing its decision.

Also weighing against the stay was the public's interest in prompt further protection of the plaintiff and the public through the civil action from what the evidence before the district court suggested likely was a counterfeiting enterprise. See Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 375 (2d Cir. 1997) (reminding courts that the "underlying purpose of the Lanham Act . . . is protecting consumers and manufacturers from deceptive representations of affiliation and origin"); Dresser Indus., 628 F.2d at 1377 (denying a stay in order to avoid the continued dissemination of false or misleading information by companies to members of the investing public).

And, as the district court found, Louis Vuitton plainly had a compelling interest in prompt resolution of the civil case, in part because of the apparent scale of the counterfeiting operation and the potential for lost sales and consumer confusion. See Order Denying Motion for Stay at 1 (noting that "[p]laintiff has an interest in the prompt prosecution of its case. Its trademark is valuable, and counterfeit goods threaten

the value of its trademark and cut into sales.").[20]  Moreover, Vuitton acted expeditiously to advance its interests, filing the present lawsuit more than a year before Lam and Chan were indicted.  In light of the length of time that the lawsuit had progressed by the time the indictments issued, and defendants' dilatory tactics during discovery, granting a stay posed a particular risk to Vuitton's interest in the prompt resolution of its claims.

Lastly, the court had reason to proceed forthwith based on its own well-recognized interest in disposing "of the causes on its docket with economy of time and effort for itself . . . ." Landis, 299 U.S. at 254.

While we thus find substantial arguments arrayed both for and against the district court's grant of a stay, we conclude

---

[20]  The defendants argue that Louis Vuitton's commercial interests must not have been in grave jeopardy because Louis Vuitton did not seek a temporary restraining order or preliminary injunction.  But the plaintiff's decision to try to bring a speedy resolution to the entire matter rather than expend its resources on temporary relief does not mean the plaintiff had no interest in a speedy resolution of its claims against the defendants.  Vuitton was plainly aware that customs officials had been active in seizing the infringing and counterfeit goods, and could have believed a temporary court order would not have dissuaded the defendants any more than those seizures already had, whereas a hefty damages award would effect a more permanent change in the defendants' operational calculus.  Indeed, the failure to seek a preliminary injunction in a case of infringement is not generally considered a factor that weighs against a plaintiff seeking permanent injunctive relief.  See, e.g., Mytee Prods., Inc. v. Harris Research, Inc., 439 F. App'x 882, 888 (Fed. Cir. 2011); see also Lermer Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996) (noting that a preliminary injunction and a permanent injunction "are distinct forms of equitable relief that have different prerequisites and serve entirely different purposes").

that the defendants were not as a matter of law deprived of their constitutional rights, or otherwise gravely and unnecessarily prejudiced, by the court's decision. The court thus did not abuse its discretion in denying the stay.

### III. Award of Attorney's Fees

The defendants argue that the district court erred in awarding attorney's fees and costs. They contend that because Louis Vuitton opted to receive statutory damages pursuant to 15 U.S.C. § 1117(c), it waived the ability to receive an award of attorney's fees. The defendants point out that unlike subsections (a) and (b) of section 1117, which explicitly provide for such an award, subsection (c) does not.

The district court, acknowledging the absence of binding precedent on this issue in this Circuit, ruled that "[a]lthough attorney's fees are frequently awarded in conjunction with actual damages, and often not awarded in conjunction with statutory damages, in [its] discretion they are appropriate here, and Plaintiff should be awarded its expenses of suit." Order Awarding Statutory Damages at 5. The district court imposed an attorney's fee award of $556,034.22, which was 100 percent of the attorney's fees, expenses, and investigative costs that Louis Vuitton had sought. Id.

On appeal, the defendants argue that in making the award the district court abused its discretion by exercising a power that it did not have. They rely heavily on a line of

42

district court decisions concluding that attorney's fees are unavailable under section 1117(a) for plaintiffs receiving statutory damages under section 1117(c), as well as on a Ninth Circuit decision, K & N Eng'g, Inc. v. Bulat, 510 F.3d 1079 (9th Cir. 2007).

In the alternative, the defendants argue that the attorney's fees awards were excessive and that reimbursement for some expenses awarded was not supported by the required documentation.

A. Standard of Review

It is of course a longstanding principle of American law that each party must pay his or her own attorney's fees irrespective of who prevails in the litigation. Reimbursement of the winning party by the losing party is not available unless there is an express statutory basis for permitting or requiring it. See, e.g., Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 186 (2d Cir. 2008) (describing statutory exceptions to the "American Rule").

Whether attorney's fees are available pursuant to section 1117(c) is a question of statutory interpretation. We therefore review the district court's conclusions de novo. DSI Assocs. LLC v. United States, 496 F.3d 175, 183 (2d Cir. 2007); Ehrenfeld v. Mahfouz, 489 F.3d 542, 547 (2d Cir. 2007). But we review the district court's decision regarding the amount of any such award for abuse of discretion. Scott v. City of N.Y., 626 F.3d 130, 132 (2d Cir. 2010) (per curiam); accord Banff, Ltd. v.

43

Colberts, Inc., 996 F.2d 33, 36 (2d Cir. 1993) (considering an award of attorney's fees under section 35 of the Lanham Act). A court abuses its discretion if it rests its decision on an erroneous determination of law or a clearly erroneous factual finding. Scott, 626 F.3d at 132.

B. Governing Law

Under Section 35 of the Lanham Act, a plaintiff seeking damages for counterfeiting and infringement has the option of seeking either actual or statutory damages, but not both. A plaintiff may recover actual damages equal to "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).[21] A plaintiff may

---

[21] Section 1117(a) states, in pertinent part:

Profits; damages and costs; attorney fees. When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 29 and 32 [15 U.S.C. §§ 1111, 1114], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for

44

elect instead to recover statutory damages for the use of a counterfeit mark that are computed "per counterfeit mark per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c).[22] The issue is plain: Does the election by a

> such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. <u>The court in exceptional cases may award reasonable attorney fees to the prevailing party.</u>

15 U.S.C. § 1117(a) (emphasis added).

> [22] Section 1117(c) states, in pertinent part:

> > Statutory damages for use of counterfeit marks. In a case involving the use of a counterfeit mark [as defined in 15 U.S.C. § 1116(d)] in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—

> > (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

> > (2) if the court finds that the use of the counterfeit mark was willful, not more than $ 2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c). At the time this suit was initiated, statutory awards ranged from not less than $500 to not more than $100,000 per counterfeit mark per type of goods sold if the use of the mark was not willful, or up to $1,000,000 per mark if the use was willful. 15 U.S.C. § 1117(c)(2004). These amounts were doubled effective October 13, 2008. <u>See</u> Prioritizing Resources

45

plaintiff to seek statutory damages under section 1117(c) instead of actual damages and profits under section 1117(a), (1) supplant only that part of section 1117(a) that provides the method for ascertaining the amount of damages with the method set forth for ascertaining damages in section 1117(c), while leaving unaffected the last sentence of the subsection -- "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party"?  Or does it (2) supplant the entirety of subsection (a) including the provision for attorney's fees in "exceptional cases"?  If the former, then the plaintiff may make such an election, as Louis Vuitton did in this case, and retain the ability to seek attorney's fees if the case is deemed by the court to be sufficiently "exceptional."  If the latter, by making the election to seek damages under subsection (c), Louis Vuitton lost the ability to obtain any attorney's fees award at all, under subsection (a) or otherwise.

Some district courts have concluded that a plaintiff who opts to receive statutory damages under section 1117(c) is indeed foreclosed from receiving attorney's fees under section 1117(a), even in an "exceptional" case.  See, e.g., Global Van Lines, Inc. v. Global Moving Express, Inc., No. 06 Civ. 3776 (RJH)(KNF), 2007 U.S. Dist. LEXIS 60794, at *12-*13 (S.D.N.Y. Aug. 20, 2007); John Wiley & Sons, Inc. v. Kauzin Rukiz Entm't & Promotions, No. 06 Civ. 12949 (SAS)(GWG), 2007 WL 1695124, at *4,

and Organization for Intellectual Property Act of 2008, Pub. L. No. 110-403, § 104, 122 Stat. 4256.

2007 U.S. Dist. LEXIS 42095, at *9-10 (S.D.N.Y. June 12, 2007); Gucci Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 522-23 (S.D.N.Y. 2004).

Other district courts -- including the court in this case -- have taken the contrary position and held that the Lanham Act does not prohibit simultaneous awards of relief under section 1117(a) and section 1117(c) so long as a plaintiff does not obtain a recovery of both actual and statutory damages. See, e.g., Louis Vuitton Malletier S.A. v. LY USA, 2008 WL 5637161, at *3, 2008 U.S. Dist LEXIS 107592, at *7-8 (S.D.N.Y. Oct. 3, 2008) ("Although attorneys' fees are frequently awarded in conjunction with actual damages, and often not awarded in conjunction with statutory damages, in my discretion they are appropriate here . . . ." (citations omitted)); Nike, Inc. v. Top Brand Co., No. 00 Civ. 819 (KMW)(RLE), 2006 WL 2946472, at *3, 2006 U.S. Dist. LEXIS 76543, at *9 (S.D.N.Y. Feb. 27, 2006) ("While there has been some question about the availability of an award of attorney's fees where statutory damages are given, courts have found both appropriate in such 'exceptional cases' of willful infringement.").

Other district courts have acknowledged this as an unsettled question without proffering an answer to it. Most frequently, courts avoid confronting the issue by implicitly or explicitly accounting for the cost of attorney's fees in setting the amount of the statutory-damages award. See, e.g., Cartier v. Symbolix Inc., 544 F. Supp. 2d 316, 320 (S.D.N.Y. 2008) ("The

47

Court finds it unnecessary to resolve this interesting question of statutory interpretation since it concludes that a modest award of [attorney's] fees . . . is appropriate either as a separate award, or as a part of an award of statutory damages."); Louis Vuitton Malletier v. WhenU.Com, Inc., No. 05 Civ. 1325 (LAK)(DFE), 2007 WL 257717, at *6, 2006 U.S. Dist. LEXIS 97550, at *17 (S.D.N.Y. Jan. 26, 2007) (award of statutory damages suffices to make plaintiff whole); Rodgers v. Anderson, No. 04 Civ. 1149 (RJH)(AJP), 2005 WL 950021, at *3-*4, 2005 U.S. Dist. LEXIS 7054, at *10-*11 (S.D.N.Y. Apr. 26, 2005) (same).

Still other district courts in this Circuit have awarded attorney's fees under section 1117(a) and statutory damages under section 1117(c) simultaneously, but without acknowledging the potential statutory hurdle they had to clear in doing so. See, e.g., Union of Orthodox Jewish Congregations of Am. v. Am. Food & Beverage Inc., 704 F. Supp. 2d 288, 293 (S.D.N.Y. 2010); Louis Vuitton Malletier v. Artex Creative Int'l Corp., 687 F. Supp. 2d 347, 358-59 (S.D.N.Y. 2010); Louis Vuitton Malletier v. Carducci Leather Fashions, Inc., 648 F. Supp. 2d 501, 505-06 (S.D.N.Y. 2009); Tiffany (NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 125 (S.D.N.Y. 2003).

The Ninth Circuit appears to be the only circuit court to have explicitly recognized this issue, although the court did not resolve it. In K & N Engineering, the district court awarded

attorney's fees under section 1117(b)[23] -- not, as in the present case, under the last sentence of section 1117(a) -- to a plaintiff who, like Louis Vuitton here, opted to receive statutory damages under section 1117(c). 510 F.3d at 1081. On appeal, the Ninth Circuit explained that "Section 1117(c) makes no provision for attorney's fees." Id. at 1082. It ruled that because the plaintiff had elected to receive statutory damages under section 1117(c), there was "no statutory basis to award [the plaintiff] attorney's fees under § 1117(b)." Id.

K & N Engineering is, however, critically different from the case at bar. There, as here, statutory damages were awarded under section 1117(c). But there, unlike here, attorney's fees had been awarded by the district court under section 1117(b), rather than 1117(a). As the court of appeals explained, "Section 1117(b)'s attorney's fees provision applies only in cases with actual damages under § 1117(a)," and the district court had assessed no such damages as a result of the

---

[23]  Subsection 1117(b) states, in pertinent part:

> In assessing damages under [§ 1117(a) for any violation of 15 U.S.C. § 1114(1)(a)] . . . the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 34(d) of this Act [15 U.S.C § 1116(d)]), in connection with the sale, offering for sale, or distribution of goods or services. . . .

15 U.S.C. § 1117(b)(emphasis added).

49

plaintiff's election to receive statutory damages instead.  Id.
The Ninth Circuit explicitly reserved the question at issue here:
"Because the fee award in this case was made pursuant to
§ 1117(b), we do not reach the issue whether an election to
receive statutory damages under § 1117(c) precludes an award of
attorney's fees for exceptional cases under the final sentence of
§ 1117(a)."  Id. at 1082 n.5.[24]

K & N Engineering thus left the present question
undecided.  Commentators remain divided.  Compare 4 Callmann on
Unfair Competition, Trademarks and Monopolies § 23:67 (4th ed.
2011) ("[A] prevailing plaintiff who elects statutory damages
under the Lanham Act in a counterfeiting case is not entitled to
attorney's fees.") with 5 McCarthy on Trademarks and Unfair
Competition § 30:95 n.9 (4th ed. 2012) (describing the Ninth
Circuit's K & N Engineering decision in the subsection (b)
context as "a hyper-technical reading of the statute" and
lamenting that it fails "to read Lanham Act § 35 as an integrated
whole").

C. Statutory Interpretation

As with any question of statutory interpretation, we
begin with the text of the statute to determine whether the
language at issue has a plain and unambiguous meaning.  Robinson

---

[24]    The plaintiffs in K & N Engineering may have sought
attorney's fees under section 1117(b) rather than section 1117(a)
because the former provides for an automatic grant of attorney's
fees together with damages, while the latter only provides for
attorney's fees in "exceptional cases," as discussed previously.

50

v. Shell Oil Co., 519 U.S. 337, 340 (1997); see also United States v. Am. Soc. Of Composers, Authors, and Publishers, 627 F.3d 64, 72 (2d Cir. 2010).  A particular statute's "plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute."  Saks v. Franklin Covey Co., 316 F.3d 337, 345 (2d Cir. 2003).  "[W]e attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole."  Pettus v. Morgenthau, 554 F.3d 293, 297 (2d Cir. 2009).  If we can ascertain the plain meaning of the statutory text by examining it in the context of the statute as a whole, we need proceed no further.  If, however, the plain meaning is ambiguous, we may consult other sources.  "Extrinsic materials have a role in statutory interpretation . . . to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005).  "We turn to the legislative history only when the plain statutory language is ambiguous or would lead to an absurd result."  In re Ames Dep't Stores, Inc., 582 F.3d 422, 427 (2d Cir. 2009) (per curiam) (internal quotation marks omitted).

1.  Textual Analysis.  Section 1117(a) distinguishes between a plaintiff's recovery and a court's discretionary award of attorney's fees in exceptional circumstances.  Recovery of

51

damages is both something to which a successful plaintiff "shall be entitled" and represents "compensation and not a penalty" in the form of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The award of attorney's fees, by contrast, is reserved for "exceptional cases." We have held, moreover, that the prerequisite to a finding that a case is sufficiently "exceptional" to warrant an award of fees is that the infringement was "willful" or in "bad faith." See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 221 (2d Cir. 2003).

Section 1117(c) characterizes the plaintiff's recovery of statutory damages as being "instead of actual damages and profits under subsection (a) of this section." 15 U.S.C. § 1117(c). To the extent that subsection (a) distinguishes between actual profits and damages on the one hand, and an award of attorney's fees on the other, then, the alternative recovery is instead of damages and profits under subsection (a), not instead of damages, profits and (in some "exceptional cases") attorney's fees under subsection (a). An award of attorney's fees in an exceptional case is thus not foreclosed. Under this reading, section 1117(a) is the primary or default source of trademark infringement remedies available to a victorious plaintiff, and section 1117(c) represents a special exception or

carveout for part of the remedy otherwise available under section 1117(a): "actual damages and profits."[25]

We find this argument compelling, because it best comports with the statutory text. The phrase "elect[ing] . . . instead of <u>actual damages and profits</u> under subsection (a)" ought not be read to mean: "elect[ing] . . . instead of <u>all remedies provided</u> under subsection (a)." In our view, so long as the "exceptional case" requirement of section 1117(a) is met, the text of sections 1117(a) and 1117(c) leaves an award of attorney's fees within the discretion of the district court.

---

[25] It may be helpful to compare section 1117(c) to section 1117(b). Section 1117(b) functions as an independent and free-standing provision separate and apart from section 1117(a) in that it has its own damages calculation and provision for attorney's fees. The fact that section 1117(b) expressly provides for attorney's fees arguably indicates that section 1117(c)'s lack of an attorney's fee provision reflects an intent not to allow the award of fees in statutory-damages cases. But the fact that both sections 1117(a) and 1117(b) specifically allow for attorney's fees suggests that section 1117(c) also allows for them, especially in light of the purpose of that subsection, and that it does so by retaining the "exceptional case" provision of section 1117(a).

The attorney's fee provisions of sections 1117(a) and (b) differ in an important respect: the former is subject to the "exceptional case" requirement, and is therefore discretionary, while the latter is mandatory. <u>See, e.g.</u>, <u>Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.</u>, 503 F.3d 588, 595 (7th Cir. 2007) (upholding a "mandatory award for attorneys' fees" pursuant to section 1117(b) because plaintiff sought relief under section 1117(a) for a violation of one of the Lanham Act provisions entitling the plaintiff to relief under subsection (b)). The automatic award of attorney's fees under section 1117(b) reflects the punitive nature of that subsection, which provides for treble damages when the use of a counterfeit mark is intentional.

53

Nonetheless, because we recognize that the text demonstrates at least some ambiguity, we turn to an examination of the purpose of section 1117(c).[26]

2. Purpose/Intent-Based Analysis. Our consideration of the history of the statute and Congress's purpose in enacting section 1117(c), reinforces our view that the election of a remedy under section 1117(c) by a plaintiff such as Louis Vuitton here does not foreclose the possibility of a recovery of attorney's fees under section 1117(a).

Before 1996, trademark remedies were governed by sections 1117(a) and (b) alone. Section 1117(a) provided as remedies -- then as now -- profits, actual damages, and costs, plus attorney's fees in an "exceptional" case. Section 1117(b) provided -- in cases of willful counterfeiting -- for treble damages, a "reasonable attorney's fee," and prejudgment interest.

In 1996, Congress passed the Anticounterfeiting Consumer Protection Act (the "Act"), which amended section 1117 to add subsection (c), providing for the alternative of statutory damages. Anticounterfeiting Consumer Protection Act of 1996,

_____

[26] Judge Livingston disagrees that the text is ambiguous and so does not join in the subsection that follows. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568 (2005) (noting that legislative history and other extrinsic materials should be relied on "only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms"). She otherwise fully joins in the analysis here.

54

§ 7, Pub. L. No. 104-153, 110 Stat. 1386 (codified at 15 U.S.C. § 1117(c)).  Congress appears to have been motivated by a gap in the law:  Plaintiffs who were victorious on their civil counterfeiting claims were often unable to obtain an adequate recovery in actual damages because counterfeiters often maintain sparse business records, if any at all.  See  S. Rep. 104-177, at 10 (1995).[27]  In passing the Act, which allows trademark plaintiffs to elect to recover statutory damages in counterfeit

---

[27] The Senate Report provides, with respect to section 7 of the Act:

> This section amends section 35 of the Lanham Act, allowing civil litigants the option of obtaining discretionary, judicially imposed damages in trademark counterfeiting cases, instead of actual damages.  The committee recognizes that under current law, a civil litigant may not be able to prove actual damages if a sophisticated, large-scale counterfeiter has hidden or destroyed information about his counterfeiting.
>
> Moreover, counterfeiters' records are frequently nonexistent, inadequate or deceptively kept in order to willfully deflate the level of counterfeiting activity actually engaged in, making proving actual damages in these cases extremely difficult if not impossible.  Enabling trademark owners to elect statutory damages is both necessary and appropriate in light of the deception routinely practiced by counterfeiters.  The amounts are appropriate given the extent of damage done to business goodwill by infringement of trademarks.

S. Rep. 104-177, at 10.

cases in lieu of actual damages, Congress apparently sought to ensure that plaintiffs would receive more than de minimis compensation for the injury caused by counterfeiting as a result of the unprovability of actual damages despite the plain inference of damages to the plaintiff from the defendant's unlawful behavior. The Act was thus apparently designed to provide an alternative to the type of recovery provided in section 1117(a); not to all of the remedies provided for in that section. The Act was meant to expand the range of remedies available to a trademark plaintiff, not restrict them.

In light of that history, it seems to us unlikely that Congress intended to prevent a plaintiff who opts to recover statutory damages from also receiving attorney's fees. If Congress's purpose in enacting section 1117(c) was to address the problem facing a plaintiff unable to prove actual damages, denying an attorney's fee award to those plaintiffs making use of the new statutory-damages election would be inconsistent with that remedial purpose. The key legislative-history sources -- the House and Senate Reports -- do not indicate that Congress intended a tradeoff between statutory damages and both actual damages and attorney's fees. See H.R. Rep. 104-556 (2005); S. Rep. 104-177.

This case is illustrative. The district court concluded that the defendants were responsible for a "massive

counterfeiting enterprise" based at least in part on plaintiff's allegations and the unavailability of records suggesting otherwise.  As we have explained, a defendant facing a statutory damage award less than the actual amount of the damages he or she caused has the incentive to frustrate ascertainment of the actual amount of the damages.  It makes little sense, we think, to further reward a defendant successful in defeating the plaintiff's and the court's attempts to fix the actual amount of damages by allowing him or her to avoid an award of attorney's fees.  Such a scheme would only further incentivize the defendant to avoid making, keeping, or producing sales records.

We therefore conclude that an award of attorney's fees is available under section 1117(a) in "exceptional" cases even for those plaintiffs who opt to receive statutory damages under section 1117(c).

D.  Application

Under the last sentence of section 1117(a), "in exceptional cases [the court] may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  We have said that "'[the Lanham Act] allows recovery of a reasonable attorney's fee only . . . on evidence of fraud or bad faith.'" Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996) (quoting Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1383 (2d Cir. 1993)); see also, e.g.,

_Patsy's Brand, Inc._, 317 F.3d at 221 ("exceptional cases" include "instances of 'fraud or bad faith' or 'willful infringement'" (citations omitted)); _Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics_, 166 F.3d 438, 439 (2d Cir. 1999)(per curiam)(same).[28]  In other words, we have concluded that the key is willfulness on the part of the defendants:  "The finding of willfulness determines the right to attorney's fees."  _Bambu Sales, Inc. v. Ozak Trading Inc._, 58 F.3d 849, 854 (2d Cir. 1995).  We have no trouble agreeing with the district court on the facts as we have described them that the infringement here was willful, involving instances of fraud and bad faith.  The award of attorney's fees was therefore justified.

The defendants argue that even so, Louis Vuitton's counsel's time and billing records were "scant" and "incomplete," thereby frustrating the inquiry into whether any of the hours charged were duplicative or unnecessary.  They argue that some of the hours were for unnecessary work, because once the district court denied the defendants' motion for a stay, the case became

---

[28]  Many district courts have looked to the "'good faith' prong of the _Polaroid_ test" for guidance "[i]n determining whether a defendant's infringing . . . conduct was carried out in bad faith" for purposes of determining whether to award attorney's fees.  _Pfizer Inc. v. Sachs_, 652 F. Supp. 2d 512, 527 (S.D.N.Y. 2009)(internal quotation marks omitted); _see also Polaroid_, 287 F.2d at 495 (considering whether a defendant demonstrated good faith in registering its own mark or the "reciprocal" of good faith in trying to claim a close variation of a mark already registered).

"hopeless" and the plaintiff was "assured of a judgment in its favor." The defendants also assert that Louis Vuitton failed to provide appropriate documentation for the fees of its private investigator and that the district court therefore should not have awarded those fees as costs.

These arguments are unsupported by the record. In assessing the reasonableness of attorney's fees, a court looks to the amount of time spent as reflected in contemporaneous time records, and then decides how much of that time was "reasonably expended." Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992). If the district court finds that some of the time was not reasonably necessary to the outcome of the litigation, it should reduce the time for which compensation is awarded accordingly. See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 434-35 (1983).

In the present case, Louis Vuitton produced more than one hundred pages of complete billing records. Some of the allegedly unnecessary work in fact resulted from the defendants' own dilatory treatment of Louis Vuitton's discovery requests. Moreover, Lam's and Chan's decision to invoke their Fifth Amendment privilege did not render legal work already completed unnecessary. We see no error on the part of the district court in making these findings.

**CONCLUSION**

For the reasons set forth above, we conclude that the district court did not abuse its discretion when it denied the defendants' motion to stay this case pending the conclusion of the related criminal proceeding.  We also conclude that the award of attorney's fees was within the discretion of the district court and that the court properly awarded attorney's fees based on the court's finding of willful infringement.

The judgments of the district court are therefore affirmed.